BOARD OF GOVERNORS OF FEDERAL RESERVE SYSTEM v. TRANS-AMERICA CORP. et al.

No. 12587.

United States Court of Appeals
Ninth Circuit.

June 27, 1950.

See also 184 F.2d 319.

J. Leonard Townsend, Solicitor, Board of Governors of the Federal Reserve System, Washington, D. C. (Gregory O'Keefe, Jr., Washington, D. C., of counsel), for petitioner.

Samuel B. Stewart, Jr., Hugo A. Steimmeyer and G. D. Schilling, all of San Francisco, Cal., for respondents.

Before HEALY, ORR and POPE, Circuit Judges.

## PER CURIAM.

An order denying a motion to dissolve a restraining order and granting an injunction containing our findings upon the issues herein, was filed on Saturday, June 24, 1950. We now proceed to state, more in detail, the facts disclosed in this proceeding, and the considerations which prompted our decision.

While the Board of Governors of the Federal Reserve System was in the process of holding hearings upon a complaint, filed under Section 7 of the Clayton Act, 15 U.S.C.A. § 18, charging Transamerica Corporation with a violation of that Act and seeking to require that corporation to cease and desist from such violations, and to divest itself of the stock of certain banks alleged to have been acquired contrary to the interdiction of the Act, the respondent Bank of America, which was also one of the banks listed in said proceedings, entered into arrangements with certain of the banks whereby the Bank of America proposed to acquire the assets of such banks.

Steps looking to the acquisition of these bank assets, although clearly planned for a considerable period, were commenced on June 20, 1950, three days prior to the institution of this proceeding, when the Comptroller of the Currency executed his consent to Bank of America to open branches at the locations of these several banks. Although the Comptroller's certificates of consent were, strictly speaking, limited to authorization to open branches, it is apparent, from the record, that he knew that acquisition of the banks' assets was contemplated, for the approved location in each case was that of the bank proposed to be acquired, and in his letter of transmittal of the certificates approving the branches, dated June 20, 1950, he listed opposite the name of each branch, the name of the bank "to be taken over".

At some date or dates subsequent to the 20th day of June written contracts were executed between the several banks and Bank of America providing for the acquisition of the formers' assets by Bank of America, which in each case was to assume the deposit and other liabilities. On the hearing before us some argument ensued as to whether these contracts were executed or executory. They fall into two categories. Those relating to state banks required the approval of the State Superintendent of Banks, who gave his approval on June 22, 1950 "effective at 3 o'clock p. m. California daylight savings time, June 24, 1950.[1]

The contracts relating to National Banks are shown to have been in the form of that made by the First National Bank of Santa Ana. It recites that it is entered into "as of the 20th day of June, 1950". Its date of actual final execution is not indicated otherwise than by the fact that the signatures on behalf of Bank of America were acknowledged before a notary on June 23, 1950.

This contract, presented as a sample of the other contracts with the National Banks, shows on its face that it was wholly executory. It provided for actual transfer at a future date. It referred to a list of assets to be transferred, subject to such changes as may occur therein to and including "the date of actual transfer thereof". In like manner the liabilities to be assumed were "subject to such changes as may occur therein to and including the date of actual transfer thereof." Another clause requires the seller to indemnify the purchaser against any action or cause of action "that may be now existing or pending and not shown by the aforesaid records of seller, or which may hereafter be commenced, based upon any transaction, matter or thing happening or occurring prior to the actual transfer of the business and assets herein referred to." The price to be paid is not fixed. It is to be based on a valuation of assets which "shall be arrived at by the officers of the respective parties". It is to include such premium on loans and such good will premiums "as may be agreed upon". Seller agrees to cease business and liquidate "after completion of the transfers provided for in this agreement.

It was admitted at the hearing that the banks referred to, and their officers, would continue to function throughout the week in which these transactions were initiated and through June 24, 1950. Further indicating that the agreements remained executory, and that the actual transfers had not been made when the restraining order hereinafter referred to was served, is a press release of the Bank of America listing the banks in question, announcing the proposed acquisition, and stating "It is expected that these offices will become part of the Bank of America as of the close of business on June 24".

On June 23, 1950 the petitioner Board of Governors of the Federal Reserve System filed herein its petition disclosing the pendency of the proceedings before it, alleging that further hearings therein are set for July 17, 1950, and that the conclusion of such proceedings will probably require 30 days thereafter. It appears that such hearings have proceeded intermittently since February 2, 1949. The petition discloses, and it is conceded here, that the complaint in that proceeding, charged that respondent Transamerica Corporation had acquired the stocks of certain banks in violation of Section 7 of the Clayton Act, and that the effect of such acquisition has been and is to substantially lessen competition, to restrain commerce, and to tend to create a monopoly. The petition was directed against Transamerica Corporation, respondent in those proceedings, and also Bank of America. It alleged the imminent acquisition of the assets of the banks, and prayed that such transfer be enjoined until the Board's proceedings could be concluded.

---

1. Although the exhibits furnished by respondent indicate that all certificates of the Superintendent of Banks were in the same form, it was stated at the hearing, and not controverted, that in some certificates the approval was made effective as of 12 noon on June 24, 1950.

The Board's Memorandum of Points and Authorities filed with its Petition, and based on appropriate allegations in the petition, discloses that our jurisdiction herein is asserted to exist by virtue of Title 28 U.S.C.A. § 1651, which provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

It is pointed out that the Board is without statutory authority to protect its own jurisdiction. Its orders may only be enforced in this court, whose jurisdiction, under Section 11 of the Clayton Act, 15 U.S.C.A. § 21, is exclusive. And, although the Board has not yet entered an order, or petitioned this court to enforce an order, yet it is argued that the jurisdiction of this court to issue an extraordinary writ in aid of its own jurisdiction is not delayed until the jurisdiction of this court is actually invoked. The writ may be issued to prevent frustration of the ultimate exercise of its jurisdiction even before an appealable or reviewable order has been entered in the tribunal below. Attention is called to the application of this principle in many cases following Barber Asphalt Paving Co. v. Morris, 8 Cir., 132 F. 945, 953, 954, 67 L.R.A. 761, where the court said: "It is obvious that the primary reason for the grant to the federal appellate courts of the dominant power to issue their writs of mandamus to the inferior courts in the exercise of and in aid of their appellate jurisdiction was to enable them to protect that jurisdiction against possible evasions of it. It is not less evident that the grant must in many, nay, in most, cases, fail to accomplish its chief end if the power to issue the writ can be exercised only after the appellate jurisdiction has been actually invoked by an appeal or by a writ of error. Under the acts of Congress the proceedings in every suit in the Circuit Court of the United States are now reviewable either in the Supreme Court or in the Circuit Court of Appeals. The moment such a suit is commenced, the appellate jurisdiction over it exists, the power and the right to ultimately review the proceedings in it are vested in one of the appellate courts. * * *

* * * * * *

"The reasons and decisions to which we have now adverted have impelled our minds with irresistible force to the conclusion that the true test of the appellate jurisdiction in the exercise or in the aid of which the Circuit Courts of Appeals may issue the writ of mandamus is the existence of that jurisdiction, and not its prior invocation; that it is the existence of a right to review by a challenge of the final decisions, or otherwise, of the cases or proceedings to which the applications for the writs relate, and not the prior exercise of that right by appeal or by writ of error; * * *" To like effect is Whittel v. Roche, 88 F.2d 366, decided by this court.

The cases just cited deal with writs issued in aid of our appellate jurisdiction. We think a like jurisdiction is granted, under Section 1651, in aid of our original jurisdiction to enforce the orders of this Board, and that it may be exercised at any stage at which it may appear reasonably necessary to preserve that jurisdiction. Indeed, in this situation, in which this court has been made the sole court vested with enforcement of this Act, our power to protect that jurisdiction is comparable to that of a district court which is confronted with a threat by litigants, or by third persons, to destroy its jurisdiction, as for example, in the case of a threatened destruction or removal of a res *in custodia legis*.[2] Here the threatened frustration is through concert between the respondents.

Federal Power Comm. v. Metropolitan Edison Co., 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408, cited by respondents was a case in which the Circuit Court of Appeals issued an order, 3 Cir., 94 F.2d 943, relating to proceedings before the Power Commission which the Supreme Court held to amount to a mere effort to exer-

2. Cf. Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & P. R. Co., 294 U.S. 648, 675, 55 S.Ct. 595, 79 L.Ed. 1110.

cise supervisory control over purely procedural steps taken by the commission, and which, under no circumstances, would be reviewable by the court. It was therefore held that section 262 of the Judicial Code, similar to the present section 1651, was inapplicable. We think that decision not in point here.

To demonstrate the threatened divestiture of the Board's jurisdiction, and hence of ours, and the irreparable damage that may result, petitioner calls our attention to Federal Trade Commission v. Western Meat Co., 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405, and Arrow-Hart & Hegeman Electric Company v. Federal Trade Commission, 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed. 1007. In the first case it was held that in a proceeding under section 11 of the Clayton Act the Federal Trade Commission could supplement an order requiring the respondent to divest itself of stock acquired in violation of Section 7 by further directing that the assets underlying the stock also be divested in a manner consistent with the purposes of the Act. In the Arrow-Hart case, it appears that during a proceeding before the Federal Trade Commission designed to compel a holding company to divest itself of stocks acquired by it in competing corporations, the several corporations involved completed an arrangement by which all of the assets formerly belonging to both original companies were transferred to a new corporation. It was held that the jurisdiction of the commission had been thereby ousted. The court said, 291 U.S. at page 599, 54 S.Ct. at page 537: "Where shares acquired in violation of the act are still held by the offending corporation, an order of divestiture may be supplemented by a provision that in the process the offender shall not acquire the property represented by the shares. Federal Trade Comm. v. Western Meat Co., 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405. In the present case the stock which had been acquired contrary to the act was no longer owned by the holding company when the Commission made its order."

■ It is therefore said that what the Respondents are about to accomplish here will serve to circumvent the possibility of the Board, in case it finds the same warranted, making an order of the kind upheld in the Western Meat Co. case, supra, and thus defeat the jurisdiction of the Board, and of this court.

We think the position thus stated is well taken.

The question which we think poses the most difficulty here is whether it is our jurisdiction, or that of some other court, which is threatened. The pertinent portion of Title 15 U.S.C.A. § 21, is as follows: "If such person fails or neglects to obey such order of the commission or board while the same is in effect, the commission or board may apply to the circuit court of appeals of the United States, within any circuit where the violation complained of was or is being committed or where such person resides or carries on business for the enforcement of its order."

The Respondent Transamerica Corporation is a Delaware corporation. The acts complained of occurred in California, where the corporation does its business. But under the rule that a corporation is deemed to reside where it is organized, it would appear that two of the three bases for selection of an enforcing court would bring the parties here, while the third would point to the Third Circuit. It is argued that until the order is entered and enforcement sought in some court, jurisdiction resides nowhere, and therefore we have none to aid.

■ It is to be noted that the Board, which is given the ultimate option to choose the enforcing court, has made its application here. To say that under the circumstances no court could do anything would lead to complete frustration. We cannot believe that Congress, in providing for alternate places of enforcement, thereby intended to withdraw in such circumstances any of the broad power granted by section 1651 of Title 28. We think the power granted by this section was intended to be adequate for all practical purposes sought to be served thereby. It is our opinion that this problem must be resolved in favor of our jurisdiction here.

■ Upon the commencement of the proceeding here we issued, ex parte, our order to show cause, returnable June 27, 1950, and our temporary restraining order enjoining the threatened acquisitions pending hearing on the order to show cause. These orders were served on respondents, it appears, on the afternoon of June 23, 1950. Initially it is contended that our restraining order is void for failure to recite the matters specified in Rule 65(b), Fed.Rules Civ.Proc., 28 U.S.C.A. What counsel have overlooked is Rule 1, which provides that the rule cited has application only to proceedings in the district courts. They have also failed to note the character of the order which we have here issued. What is sought, and we have granted, is a writ of injunction, serving the same general purpose of the coordinate writs of mandamus and prohibition, and designed, not as an injunction in equity, however much equitable principles must be applied, but solely as a writ in aid of the jurisdiction of this court. The restraining order, which was served with the order to show cause, the petition, and the memorandum of points and authorities, left the respondents in no uncertainty as to what they were commanded to do, or as to the reasons therefor.

Although the order to show cause was made returnable June 27, and set for hearing June 28, the respondents appeared by motion to dissolve the restraining order and at the request of both parties the hearing on the petition, and the motion to dissolve the restraining order was held at 10 A.M. Saturday, June 24. Upon this hearing it was urged that the proposed transfer of assets had already been completed before this court's order issued; that we were confronted with a *fait accompli,* about which we could do nothing, at any rate with the type of injunction here sought. We think this is not so. We have previously noted the executory character of the agreements and the press release statements that the transfer was to be effected as of the close of business on June 24, 1950, until which time the individual banks, and their officers were continuing to transact business at their respective locations.

No delivery of possession had taken place when the court's order issued, or when the hearing was begun. Possession was then still in the several banks. Our restraining order calls for no more than that respondent Bank of America refrain from taking such possession.

■ It is said that the respondent Bank had then committed itself, by contract, to complete the transaction. Even if the contracts had been arrived at by parties dealing at arms length, it requires no demonstration that an act which otherwise might be enjoined, does not become immune to injunction because a party defendant has made a contract to do the thing forbidden. The claim that these executory contracts, signed by one of the respondents on the one side, and by banks controlled by the remaining respondent on the other,—engagements on which the ink was hardly dry—have put this transaction beyond injunction is of a stripe with the argument that the injunction may not issue because the respondents have made public announcement of their intentions.

■ One of the grounds stated in the motion to dismiss the restraining order was that the Comptroller, in issuing the certificates consenting to the opening of branches, had thereby adjudicated the validity of the proposed transfers, including all questions relating to Clayton Act violation. At first it was sought to lend color to this claim by quoting testimony of a deputy comptroller before a Congressional committee. But as the hearing progressed this claim was apparently abandoned, as necessarily it must be, for the Comptroller clearly neither has such authority, nor purported to exercise it. The facts do show an unfortunate working at cross purposes of two government agencies. What we say is not to be taken as a criticism of the Comptroller for thus apparently lending aid to an attempted evasion of the order of the Board of Governors. Apparently the Comptroller felt obliged to issue these certificates in return for an agreement of the respondent bank to increase its capitalization to a figure which he thought necessary in the

public interest. Doubtless the Comptroller deplored a state of the law which reduced him to this expedient. But in making his decision he neither considered, nor was charged with determining, any of the issues committed to the Board of Governors.

Matters have been called to our attention which bear upon a balancing of convenience as between the parties. We find no such inconvenience to respondents as would lead us, in our discretion, to stay our hand. It is claimed that the Board unduly delayed in instituting this proceeding. The correspondence between the Board of Governors and the Comptroller, through which admittedly knowledge first came to the Board of Governors, was produced at the hearing, and both parties read therefrom. From this it appears that the Board of Governors was advised by letter dated June 14, 1950, that issuance of the certificates for branches was under consideration, but it was not until June 20, 1950, that the Board was advised that they would be issued. The institution of this proceeding three days later disclosed all possible diligence.

It is asserted that substantial sums have been expended in preparation for the acquisition of these banks; that wide publicity has been given by letters to depositors, press releases and the like. It is shown that the directors of the several banks have surrendered their qualifying shares in those banks to the respondent corporation. We find here no insuperable difficulties. Respondent corporation may easily return the stock, which no doubt, must, to satisfy the law, be retained in ownership by the directors until possession is passed.

As for the expenditures and other inconveniences mentioned, it appears to us that for the situation in which respondents now find themselves they have to thank not the institution of this proceeding, but their own unseemly haste. Notwithstanding the many months during which the substantial issues raised in the proceedings before the Board were being considered, and knowing that the validity of Trans-america's ownership of the very stock that had to be voted to bring about this precipitate transaction was in issue in those proceedings, the arrangements were rushed through in a manner which would appear to us hardly compatible with the sure and dignified procedure traditional in the banking business. We cannot hold the Board at fault for not anticipating such procedures. With it all, whether there be any truth in it or not, the respondents laid themselves open to being suspected of contriving an adroit design to circumvent the proceedings before the Board.

On the other side of the shield is the public interest, the protection of which Congress has commanded by the enactment of the Clayton Act which is designed to prevent monopoly and other restraints upon trade and commerce. This interest is paramount. The public convenience in a matter of this kind is such as to outweigh any other considerations which have here been presented to us.

The facts with which the Board is dealing are not before us. Nor do we assume that the Board will ultimately find that the stock acquisitions of which complaint has been made are such as will substantially lessen competition, or tend to monopoly. But we cannot assume that such results could not appear. Indeed, in making these sections applicable to banks, and in vesting jurisdiction in the Board of Governors of the Federal Reserve System, Congress must have recognized the possibility that there could be detrimental monopolization and restraints of trade in the banking field. We think that to prevent the appropriate agency of government from protecting the public interest in this respect would cause irreparable damage.

The conclusions here developed were all clearly indicated in our injunctive order of June 24, entered subsequent to the hearing. Time was lacking, however, to enlarge upon the reasons for them; and the purpose of this opinion is to state those reasons fully and to cite the authorities which we consider as supporting them.