POTOMAC ELECTRIC POWER
COMPANY, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Consolidated Rail Corporation,
Intervenor.

No. 81–2375.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 14, 1982.

Decided March 1, 1983.

Supplemental Opinion March 31, 1983.

Supplemental opinion, D.C.Cir., 705
F.2d 1343.

J. Raymond Clark, Washington, D.C., with whom Mary Todd Foldes, Washington, D.C., was on the brief, for petitioner.

Timm L. Abendroth, Atty., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, and Ellen D. Hanson, Associate Gen. Counsel, I.C.C., Washington, D.C., were on the brief, for respondents. Robert S. Burk and Kathleen M. Dollar, Attys., I.C.C., and John J. Powers, III, and Kenneth P. Kolson, Attys., U.S. Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Paul A. Cunningham, Washington, D.C., with whom Arthur W. Adelberg, Marc D. Machlin, Charles N. Marshall, Washington, D.C., and John A. Daily, Philadelphia, Pa., were on the brief, for intervenor.

Before ROBINSON, Chief Judge, TAMM, Circuit Judge, and J. EDWARD LUMBARD,* Senior Circuit Judge for the Second Circuit.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Potomac Electric Power Company (PEPCO) seeks review of an order of the Interstate Commerce Commission (Commission) reopening a proceeding initiated in 1974 by appellant PEPCO to protest rates charged by intervenor-respondent Consolidated Rail

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

Corporation (Conrail) for hauling coal to three of PEPCO's generating plants. We find that, in the context of this case, the Commission has unreasonably delayed disposition of PEPCO's complaint and invoke the power granted this court in 5 U.S.C. § 706(1) (1976) to order the Commission to proceed expeditiously to a final resolution of PEPCO's complaint.

## I. COMMISSION PROCEEDINGS

The administrative proceedings leading to this appeal trace their ancestry to a complaint filed by appellant PEPCO with the Commission on December 23, 1974. In its complaint before the Commission, PEPCO attacked the lawfulness of freight charges levied by certain eastern railroads for hauling coal from various eastern mines to three of PEPCO's electric generating stations in Maryland, located at Herbert (Chalk Point station), Woodzell (Morgantown station), and Dickerson (Dickerson station). In its first decision in these proceedings, issued more than two years later, the Commission held that neither the unit-train rates nor the trainload[1] rates to Chalk Point and Morgantown were shown to be unreasonable, but that the trainload rate for shipping coal to the Dickerson station was unjust and unreasonable in violation of section 1(5) of the Interstate Commerce Act.[2] *Potomac Electric Power Co. v. Penn Central Transportation Co. (PEPCO I)*, 356 I.C.C. 815, 823, 826–28 (1977). In addition, the Commission refused to order the Penn Central to publish unit-train tariffs for coal shipments in carrier-supplied rail cars. *Id.* at 828.

The proceeding was reopened for the limited purpose of determining the maximum trainload rates to be charged for service to the Dickerson station and the effect of that maximum rate on the structure of eastbound coal rates. *Id.* Subsequently, in proceedings not now on review, the Commission prescribed a revenue-to-variable cost ratio of 190 percent as the maximum trainload rate for coal shipped to the Dickerson station. *Potomac Electric Power Co. v. Penn Central Transportation Co. (PEPCO II)*, 359 I.C.C. 222, 240 (1977). Reparations for past overcharges were denied, *id.* at 241, but the Commission stated that carriers were on notice that from the date of the *PEPCO II* decision, October 21, 1977, reparations would be awarded.[3] *Id.* The Commission affirmed its *PEPCO II* decision following a petition for reconsideration filed by some of the rail carriers affected. *Potomac Electric Power Co. v. Penn Central Transportation Co. (PEPCO III)*, 359 I.C.C. 849, 863–64 (1978).

PEPCO sought review in this court of the portion of the Commission's decision in *PEPCO I* that affirmed the unit-train rates as not being unreasonable and that upheld Penn Central's right to refuse to publish rates for unit-train service in carrier-supplied cars. We held that the Commission acted properly in refusing to order Conrail, successor to the Penn Central, to offer and publish the requested rates for unit-train service in carrier-supplied cars, but remanded the case to the Commission for further consideration of the unit-train rates at issue. *Potomac Electric Power Co. v. United States*, 584 F.2d 1058, 1067 (D.C.Cir.1978). We took this action for two primary rea-

---

1. In the vernacular of the Commission, a unit-train is "the repeated movement of dedicated cars as a single unit." Investigation of Railroad Freight Rate Structure Coal, 345 I.C.C. 71, 514 (1974). In other words, rail cars in use in a unit-train are kept together as a complete train, which is then shuttled back and forth between origin and destination without uncoupling the cars that comprise the train. In contrast, a trainload rate for coal refers to "ordinary equipment in single moves at random times without reference to any scheduled operation." *Id.* at 114. While a trainload shipment is similar to a unit-train shipment in size, the critical

difference is that the rail cars employed in a trainload rate must be assembled into a train for each shipment.

2. Section 1(5) of the Interstate Commerce Act was recodified as 49 U.S.C. § 10701 in Act of Oct. 17, 1978, Pub.L. No. 95–473, § 1, 92 Stat. 1337, 1371–72.

3. Reparations are awarded by the Commission under authority granted it in 49 U.S.C. § 11705(b)(3) (Supp. IV 1980), as compensatory damages to persons injured by rail carriers' violations of the Interstate Commerce Act.

sons: because the Commission failed to consider the use of average rate-to-variable cost ratios in determining the reasonableness of unit-train rates, when it had stated that such average cost ratios were relevant; and because the Commission had not adequately explained the reasons for certain actions or policies pursued in its decision. *Id.* at 1064.

The Commission's response to our mandate was to reopen the proceedings to consider new evidence and additional issues relating to the reasonableness of the contested rates. *Potomac Electric Power Co. v. Consolidated Rail Corp.*, No. 36114 (Sub-No. 1) (I.C.C. Apr. 10, 1979), *reprinted in Potomac Electric Power Co. v. Consolidated Rail Corp. (PEPCO IV)*, 362 I.C.C. 169, 192–95 (1980). Because significant changes had occurred in the unit-train coal shipments at issue, the Commission began an entirely new hearing, although the record developed in *PEPCO I* was brought into the new proceedings. *PEPCO IV*, 362 I.C.C. at 187. In *PEPCO IV* the Commission applied to the contested rates a new standard of reasonableness that was developed in a series of Commission proceedings involving coal shipments from western mines. *Id.* at 188–90. This new standard established as reasonable rail rates that included fully allocated costs,[4] a 10.6 percent after-tax return on capital and an added margin of 7 percent to permit differential pricing.[5] The existing record developed in *PEPCO I* was held inadequate to support a finding under this new standard, and the parties were requested to submit additional evidence relating to the movements of coal to PEPCO's three generating plants. *Id.* at 187–88.

Before this new standard was applied to the evidence submitted in this case, the Commission adopted yet another set of standards for determining maximum rates in coal shipments. Responding to our remand for further proceedings in *San Antonio, Texas v. United States*, 631 F.2d 831 (D.C.Cir.1980), the Commission proposed replacing the ratio method adopted in the western coal proceeding with a methodology that utilized ton/ton-mile cost figures[6] and which eliminated some additives to rates. Coal Rate Guidelines Nationwide [*Ex Parte No. 347 (Sub-1)*], 45 Fed.Reg. 80,370 (Proposed Guidelines Dec. 4, 1980). Although our remand in *San Antonio* pertained to movements of coal from Wyoming coal mines to a power plant near San Antonio, the Commission proposed to use the ton/ton-mile methodology for reviewing rates for all coal shipments. *Id.* at 80,371.

4. Fully allocated costs have been defined by the Commission to represent "that level of expenses which represents the sum of 'variable costs' plus an appropriate allocation of fixed expenses, i.e., an allocation which assigns an adequate portion of fixed expenses to the movement of traffic on which the rate in issue applies." Rules to Govern the Assembling and Presenting of Cost Evidence, 337 I.C.C. 298, 308 (1970).

5. Differential pricing is a practice that allows a rail carrier to charge different shippers different rates, depending on the amount of competition a rail carrier faces from other traffic modes. By allowing a margin of 7 percent over fully allocated costs, the Commission permitted a carrier to obtain extra profits on less competitive traffic to make up for lower earnings garnered where competition was more intense. *See San Antonio, Texas v. United States*, 631 F.2d 831, 850–53 (D.C.Cir.1980) (remanding for reconsideration of basic cost calculations and margin for differential pricing); *see also Potomac Electric Power Co. v. Consolidated Rail Corp. (PEPCO IV)*, 362 I.C.C. 169, 189 (1980).

6. The Commission has described the differences between the two methods as follows:

Under both the ratio and ton/ton-mile method, the railroad's expenses are initially separated between those that can be directly related to specific movements (variable costs) and those that are related to the entire system operation (constant costs). Under the ratio method, the constant costs are then distributed among specific movements in proportion to revenue generated by those movements. Under the ton/ton-mile method, the constant costs are further divided into those associated with terminal operations, and those that are associated with line-haul service. The former are then allocated to specific movements in proportion to tons originated and terminated, and the latter are allocated to specific movements in proportion to tons times distance traveled, that is, ton-miles.

Coal Rate Guidelines Nationwide [Ex Parte No. 347 (Sub-1)], 45 Fed.Reg. 80,370, 80,372 n. 4 (Proposed Guidelines Dec. 4, 1980).

The methodology proposed in *Ex Parte No. 347 (Sub-1)* was incorporated into the reopened *PEPCO* proceeding. After considering new evidence submitted by the parties, an administrative law judge (ALJ) determined that the unit-train tariffs at issue *were* unreasonably high. *Potomac Electric Power Co. v. Consolidated Rail Corp.,* No. 36114 (Sub-No. 1) at 14, (I.C.C. Feb. 24, 1981) (Decision of Administrative Law Judge Browning). Utilizing the ton/ton-mile methodology being proposed by the Commission in *Ex Parte No. 347 (Sub-1),* the ALJ prescribed the maximum rates. *Id.* at 15. No award of reparations was made, however. *Id.* at 14.

Both PEPCO and Conrail appealed the ALJ's decision to the Commission. Under the time limits imposed by 49 U.S.C. § 10327(f)(2) (Supp. IV 1980), the Commission had 180 days in which to decide the appeal. The Commission invoked its right to a 90-day extension,[7] however, and delayed the determination of the appeal. At the end of this 90-day period, the Commission announced it was reopening the record for new evidence, Brief for Respondent Commission at 6, because it had decided not to adopt the ton/ton-mile methodology proposed earlier. *Ex Parte No. 347 (Sub No. 1),* 46 Fed.Reg. 62,958 (Interim Decision Dec. 29, 1981). No substitute methodology was suggested, and the Commission stated that all maximum rate prescriptions on coal would be made on "case-by-case adjudication at least until remaining issues are resolved." *Id.* Subsequently the Commission directed the parties in this case to submit schedules for providing new data in response to the Commission's decision in *Ex Parte No. 347 (Sub No. 1)* and a related proceeding, *Complaints Filed Under Section 229 of the Staggers Rail Act of 1980, [Ex Parte 411],* 365 I.C.C. 507 (1982). *See Potomac Electric Power Co. v. Consolidated Rail Corp.,* No. 36114 (Sub-No. 1), at 6 (I.C.C. Mar. 31, 1982), *reprinted in* Brief for Respondent Commission at App.B. PEPCO now seeks review in this court of the Commission's decision to reopen the proceedings.

## II. JURISDICTION TO REVIEW THE PROCEEDINGS AT THIS STAGE

At the threshold we must determine whether this court has jurisdiction to hear PEPCO's present appeal. We hold that it does. Jurisdiction over PEPCO's present appeal could rest on four possible bases. The decision to reopen the proceedings could be construed to be a final order reviewable under 28 U.S.C. §§ 2321 and 2342(5); alternatively, 49 U.S.C. § 10327 (f)(2) and (j) could be interpreted to make the ALJ's decision a final order of the Commission. Jurisdiction could also be established on two other bases through the power to issue a writ of mandamus granted in 28 U.S.C. § 1651(a): we have the inherent power to construe the mandate of our earlier decision, and we might employ our power of mandamus to aid our future appellate jurisdiction over these proceedings.

■ Under 28 U.S.C. § 2342(5) (Supp. IV 1980), we have jurisdiction to review final orders of the Commission made reviewable by 28 U.S.C. § 2321 (1976 and Supp. IV 1980). In administrative proceedings this requirement of finality has been interpreted "in a pragmatic way" to permit judicial review of agency actions that might not otherwise be administratively complete. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149–50, 87 S.Ct. 1507, 1515–1516, 18 L.Ed.2d 681 (1967). One criteria for reviewing such non-final actions is whether the agency action has the force of law, regardless of whether further administrative proceedings are necessary to implement the agency decision. *Id.* at 150, 87 S.Ct. at 1516; *Columbia Broadcasting System v. United States,* 316 U.S. 407, 416–18, 62 S.Ct. 1194, 1199–1200, 86 L.Ed. 1563 (1942); *see Environmental Defense Fund v. Ruckelshaus,* 439 F.2d 584, 589 & n. 8 (D.C.Cir. 1971) (agency action is final if it "denies a right with consequences sufficient to warrant review"). Another consideration is whether judicial review will disrupt the orderly process of adjudication, *Port of Bos-*

---

**7.** See 49 U.S.C. § 10327(j) (Supp. IV 1980).

ton Marine Terminal Ass'n v. Rederiaktie-bolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970), in which case review should be deferred until a more acceptable stage of the proceedings is reached. See ICC v. Atlantic Coast Line R. Co., 383 U.S. 576, 602–04, 86 S.Ct. 1000, 1015–1016, 16 L.Ed.2d 109 (1966).

The Commission argues that its decision to reject the methodology employed by the ALJ in his decision and its subsequent decision to reopen the proceedings for additional data preclude a finding of finality at this point. Brief for Respondent Commission at 11–14. We understand appellant PEPCO to say that the decision to reopen was arbitrary and capricious and, consequently, might be considered a final order because it affects PEPCO's right to a timely decision under 5 U.S.C. §§ 555(b), 706(1) (1976) and 49 U.S.C. § 10327 (Supp. IV 1980). See Brief for Petitioner at 24–26. Cf. Environmental Defense Fund v. Hardin, 428 F.2d 1093, 1100 (D.C.Cir.1970) (delay may amount to refusal to act and be subject to review). This right is important, but the decision to reopen this case, when considered alone, indicates that the Commission has not yet stated a definite position nor reached a decision having the force of law sufficient to establish the finality required by 28 U.S.C. §§ 2321, 2342(5) (1976 and Supp. IV 1980). See Abbott Laboratories v. Gardner, 387 U.S. 136, 151–52, 87 S.Ct. 1507, 1516–1517, 18 L.Ed.2d 681 (1967). Moreover, basing review at this time simply upon the decision to reopen the proceeding could disrupt the orderly process of adjudication. If possible, the Commission should be allowed to apply its full expertise to develop a rate methodology, even if only on a case-by-case basis, for disposing of coal rate proceedings. Consequently, we cannot rest our jurisdiction on grounds that the decision to reopen, per se, is a final order.

An alternative reason for finding a final order upon which to base this appeal relates to a provision of the Interstate Commerce Act, 49 U.S.C. § 10327 (Supp. IV 1980). PEPCO argues that section 10327 should be interpreted to make the ALJ's decision a final order of the Commission for its failure to meet the deadlines of section 10327 for reviewing initial Commission decisions. Section 10327(f)(2) requires that the Commission decide all appeals within 180 days of the filing of the appeal. This deadline can be extended once for 90 days under the terms of section 10327(j), which requires that the Commission take a public vote on the extension and make a note of that extension in an annual report to Congress. Appeal proceedings can be extended even further under section 10327(k), but there is no evidence that the Commission took the special public vote and special written report to Congress necessary to utilize the escape valve provided by section 10327(k). PEPCO argues that since the directives of subsections 10327(f)(2) and (j) are mandatory, the effect of the Commission's failure to abide by their limits is to make the initial decision of the ALJ the final decision of the Commission and thus subject to review under 28 U.S.C. § 2342(5) (Supp. IV 1980). Brief for Petitioner at 14–15.

There should be no doubt about our power to resolve this issue of statutory construction, as our power to do so follows from our paramount duty to determine whether we have jurisdiction. See Land v. Dollar, 330 U.S. 731, 739, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947); United States v. United Mine Workers of America, 330 U.S. 258, 265–95, 67 S.Ct. 677, 682–696, 91 L.Ed. 884 (1947); see also Western Waste Service Systems v. Universal Waste Control, 616 F.2d 1094, 1096 (9th Cir.1980) (interpreting statute to determine scope of jurisdiction). Moreover, in fulfilling this duty we in no way circumvent the limitations Congress imposed on our jurisdiction in 28 U.S.C. § 2342(5). If the ALJ decision has become a final order, then the basic concerns of the finality requirement have been met.

Nevertheless, we find it unnecessary to resolve this issue of statutory construction in order to establish our jurisdiction to consider PEPCO's concerns over untimely decisionmaking. Because an affirmative response to PEPCO's argument would compel us to address the merits of the ALJ decision

and involve us in the resolution of issues not fully briefed, we prefer to leave to another day the question of the effect of the Commission's failure to meet its statutory deadlines. In addition, the Commission has issued policy guidelines in *Ex Parte No. 347 (Sub-1)* and *Ex Parte 411* that may play a role in resolving this rate dispute; allowing the Commission to incorporate that thinking into its determination of the appeal from the initial decision may also help the Commission fashion a meaningful rate methodology to govern other coal rate cases. As will be shown below, however, the statutory deadlines of section 10327 are relevant to whether PEPCO's rights have been violated.

■■■ The question whether PEPCO's right to a timely decision from the Commission has been violated can be reviewed through our inherent power to construe the mandate of our earlier decision. *Floersheim v. Engman,* 494 F.2d 949 (D.C.Cir. 1973). Congress has empowered federal courts to issue a writ such as mandamus, 28 U.S.C. § 1651(a) (1976), if necessary to effectuate or prevent the frustration of orders previously issued. *United States v. New York Telephone Co.,* 434 U.S. 159, 172–73, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977). Consequently, section 1651(a) operates as an aid to our inherent power to determine whether the Commission has complied with that mandate.[8] While our review of the Commission's actions in response to our earlier decision will be limited to the scope of the earlier remand, this restriction does not mean we cannot address the heart of PEPCO's present appeal, whether the Commission's long-delayed resolution of this tariff dispute has violated PEPCO's right to a timely decision under 5 U.S.C. §§ 555(b), 706(1) (1976) and 49 U.S.C. § 10327 (Supp. IV 1980). If our earlier mandate compelled

the Commission to act in a timely manner, and if it has failed to do so, we may correct its error by use of a writ of mandamus. *See United States v. United States District Court for the Southern District of New York,* 334 U.S. 258, 264, 68 S.Ct. 1035, 1038, 92 L.Ed. 1351 (1948); *Delaware, Lackawanna & Western R.R. v. Rellstab,* 276 U.S. 1, 5, 48 S.Ct. 203, 205, 72 L.Ed. 439 (1928); *City of Cleveland v. Federal Power Commission,* 561 F.2d 344, 346 (D.C.Cir.1977).

■■■ The authority granted in section 1651(a) also apprehends instances where future review may be jeopardized, empowering a federal court to issue a writ of mandamus to protect its future jurisdiction. *FTC v. Dean Foods Co.,* 384 U.S. 597, 603, 86 S.Ct. 1738, 1742, 16 L.Ed.2d 802 (1966); *United States v. United States District Court for the Southern District of New York,* 334 U.S. at 263, 68 S.Ct. at 1037; *Federal Power Commission v. Metropolitan Edison Co.,* 304 U.S. 375, 384–85, 58 S.Ct. 963, 967, 82 L.Ed. 1408 (1938); *Refractarios Monterrey, S.A. v. Ferro Corp.,* 606 F.2d 966 (Cust. & Pat.App.1979); *Board of Governors v. Transamerica Corp.,* 184 F.2d 311, 315 (9th Cir.1950). In the confines of this case, once the Commission has rendered a decision on the appeal from the ALJ's initial decision, the issue of the timeliness of the Commission's decision will be moot. Consequently, if review is denied until the Commission's decision, there will be no effective remedy for the parties harmed by the Commission's delay, even if that delay directly contravenes the intent of Congress in enacting 49 U.S.C. § 10327(f)(2). Since this possibility directly affects the scope of our future jurisdiction over any appeal of an eventual final order of the Commission, section 1651(a) permits us to determine whether the decision to reopen the proceedings was outside the Commission's discre-

---

**8.** Respondent Commission argues that local rule 13(d) precludes a finding that we have jurisdiction in this appeal. Brief of Respondent Commission at 25 n. 19. Local rule 13(d) provides in part:

    If the CASE, is remanded, this court does not retain, jurisdiction, and a new Notice of Appeal or Petition for Review will be necessary

if a party seeks review of the remand proceedings.

We note that this rule only makes clear that a remand of a case requires new jurisdictional grounds to be established if an appeal is taken after the remand of the case. The rule in no way circumscribes this court's power to construe its own mandate that led to the remand.

tion and whether mandamus is proper in these circumstances to order the Commission to proceed forthwith to a decision. *See MCI Telecommunications Corp. v. FCC,* 627 F.2d 322, 340–42 (D.C.Cir.1980); *Silverman v. NLRB,* 543 F.2d 428, 430 (2d Cir.1976).

In summary, we find that the question whether the Commission has unreasonably delayed reaching a final decision is properly before us, either·because such delay violates our earlier mandate or because it jeopardizes our future review of the final Commission decision.

III. THE RIGHT TO TIMELY DECISIONMAKING

At the heart of PEPCO's present appeal is its demand for a final determination of the issues remaining unresolved in this prolonged proceeding. The initial complaint in this case was filed more than eight years ago, and contrary to the Commission's assertion, Brief for Respondent Commission at 25, issues presented in the initial complaint remain unresolved. Although the Commission did find the disputed unit-train tariffs not to be unreasonable in its April 1, 1977 decision, *PEPCO I,* 356 I.C.C. at 826–27, this court reversed the Commission with respect to that finding and ordered further consideration of the issues involved in approving those tariffs. *Potomac Electric Power Co.,* 584 F.2d at 1067. Upon remand the Commission reopened the proceedings for new evidence, incorporating the existing record into the record for the redesignated proceedings. *PEPCO IV,* 362 I.C.C. at 186. In its January 3, 1980 decision, the Commission appeared to resolve the issue whether the unit-train rates were unreasonable as of April 1, 1977. *PEPCO IV,* 362 I.C.C. at 192. Yet in his decision of February 24, 1981, the ALJ apparently considered the *entire* record in determining not to award reparations for past shipments. *See Potomac Electric Power Co. v. Consolidated Rail Corp.,* No. 36114 (Sub-No. 1) at 14 (I.C.C. Feb. 24, 1981) (Decision of Administrative Law Judge Browning). In contrast, in *PEPCO II* the Commission put the carriers on notice that from October 21, 1977, reparations would be awarded. *PEPCO II,* 359 I.C.C. at 241. This suggests to us, at least, that some dispute may remain concerning the unit-train rates from 1974 to 1977.

As noted above, PEPCO argues that 49 U.S.C. § 10327 (Supp. IV 1980) makes the ALJ decision a final order of the Commission because of its failure to meet the deadlines of section 10327 for reviewing initial Commission decisions. Although we have declined to base our jurisdiction to address the merits of this appeal on that ground, we consider section 10327 enlightening as it pertains to PEPCO's right to a timely decision. Section 10327 was adopted as part of the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act), Pub.L. No. 94–210, § 303(a), 90 Stat. 31, 48–50. Although each house of Congress addressed the problem of Commission delay differently, both houses expressed serious concern over the need to improve the administrative efficiency of the regulatory process. The Senate Committee on Commerce, in its report accompanying S. 2718, the Senate version of the 4–R Act, decried the problems of regulatory delay, stating that such delay "erode[s] the confidence of the public in needed regulation." S.Rep. No. 499, 94th Cong., 1st Sess. 15 (1975), U.S.Code Cong. & Admin.News 1976, 14, 29. To meet this concern the Senate approved section 205 of S. 2718, which required the Commission within one year of the effective date of the 4–R Act to dispose of all pending proceedings that it had initiated and within three years all future investigations initiated by it. In addition, all applications requiring affirmative action on the Commission's part were presumed approved if the Commission failed to act within two years of the application. *See* S. 2718, 94th Cong., 1st Sess., § 205, 121 Cong.Rec. 34,492, 38,498 (amended and passed Senate Dec. 4, 1975). The House version of the 4–R Act, H.R. 10979, addressed the problem of Commission delay by proposing timetables for completing initial decisions and intra-agency appeals. *See* H.R. 10979, 94th Cong., 1st Sess., § 207, *reprinted in* H.R.Rep. No. 725, 94th Cong.,

1st Sess. 9–10 (1975).[9] The House Committee on Interstate and Foreign Commerce recommended these provisions over the express objections of the Commission, H.R. Rep. No. 725, 94th Cong., 1st Sess. 224, 229–33 (1975) (comments of the ICC), because the Committee felt that "[t]he public and those participating before the Commission, should be able to expect some certainty as to when the procedures will end." *Id.* at 61. Members of Congress applauded these measures during floor debate on the 4–R Act,[10] and in conference, both the House and Senate provisions were melded into section 303(a) of the 4–R Act. *See* H.R.Rep. No. 781, 94th Cong., 2d Sess. 159–62 (1976) (Report of the Conference).

The concerns over long-delayed proceedings evident in the text of section 10327 and in the legislative history accompanying that provision are important to our decision in this appeal. It is beyond cavil that Congress wanted a change in the speed with which the Commission performed its regulatory duties. Although Congress granted the Commission some discretion to reopen a proceeding or change an earlier decision, *see* 49 U.S.C. § 10327(g)(I) (Supp. IV 1980), that discretion is limited by the otherwise strong statement by Congress that the Commission must act in a timely manner. As was stated by this court in an earlier, analogous decision, *MCI Telecommunications Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir.1980), there must be a "rule of reason" to govern the time limit to administrative proceedings. Quite simply, excessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decisionmaking into future plans. *See generally British Airways Board v. Port Authority*, 564 F.2d 1002, 1010 (2d Cir.1977) (delay can threaten introduction of new technology); *Nader v. FCC*, 520 F.2d 182, 207 (D.C.Cir.1975) (excessive delay can lead to the breakdown of the regulatory process).

The remedy ordered in *MCI* was predicated upon the authority conferred on courts in 5 U.S.C. § 706(1) (1976) to compel agency action unreasonably delayed. This authority dovetails with the directive contained within 5 U.S.C. § 555(b) (1976) that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." As part of the Administrative Procedure Act, statutory guidelines such as these are part of the rules that govern administrative action, but Congress has also enacted the very specific timetable in 49 U.S.C. § 10327 to address the problem of Commission delay. Consequently, our remand in the earlier appeal to this court implicitly included the understanding that the Commission would respond to our mandate in a timely manner.

Although our construction of our earlier mandate furnishes us with jurisdiction to fashion an appropriate remedy, we are also able to base our jurisdiction to do so on another ground. The power grounded in 5 U.S.C. § 706(1) to compel agency action can also be effectuated through the use of a writ of mandamus. Although we are mindful of the rule that mandamus is an extraordinary remedy, *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35–36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980) (per curiam); *La Buy v. Howes Leather Co.*, 352 U.S. 249, 257–58, 77 S.Ct. 309, 314, 1 L.Ed.2d 290 (1957), this case presents an appropriate instance for use of that writ. The respondents argue that no irreparable harm will befall PEPCO as a result of any delay because reparations are available as a remedy if the unit-train rates are eventually found unreasonable. Brief for Respondent Commission at 29; Brief for Respondent Conrail at 25. That argument misses the point, since Congress has specifically mentioned

---

**9.** H.R. 10979 passed the House on December 17, 1975. 121 Cong.Rec. 41,404 (1975). The Senate bill, S. 2718, was then called up, *id.*, and approved after the text of H.R. 10979 was substituted for the text passed by the Senate. *Id.* at 41,429.

**10.** *See* 121 Cong.Rec. 38,487, 41,343, 41,397 (1975) (remarks of Senator Thurmond, Congressmen Hastings and Conte, respectively).

the deleterious effect Commission delay has on the confidence and credibility the public places in the Commission, an interest also shared by parties involved in an administrative proceeding. H.R.Rep. No. 725, *supra,* at 61. Reparations may fail to make PEPCO whole, *see MCI,* 627 F.2d at 345 (quoting *Nader v. FCC,* 520 F.2d at 206–07), and existing uncertainty may affect PEPCO's ability to make future plans.[11] Even the size of possible reparations may grow to the magnitude that a decision on the reasonableness of the rates is affected. *Cf. Nader v. FCC,* 520 F.2d at 206 (refund could be staggering in size). In addition, once the Commission has rendered a final decision, the issue of regulatory delay will be moot and beyond our effective power to remedy. Since this fact affects our future jurisdiction to review this controversy, a case for mandamus is established.

From the record it appears that the Commission has understood its statutory responsibilities under section 10327. Again and again the Commission has promised to expedite this matter, but without delivering. For example, in *PEPCO IV,* decided nearly three years ago, the Commission stated:

> The parties are advised that once we establish procedural dates, we do not intend to postpone them. We intend to expedite a decision on the merits while according the parties an opportunity to present all relevant evidence regarding current rate/cost relationships.

*PEPCO IV,* 362 I.C.C. at 190. *See also Potomac Electric Power Co. v. Conrail,* No. 36114 (Sub-No. 1), (I.C.C. Apr. 10, 1979), *reprinted in PEPCO IV,* 362 I.C.C. at 192–94; *PEPCO I,* 356 I.C.C. at 828 (limiting parties to 60 days in which to respond to decision of Apr. 1, 1977). The hollowness of these promises illustrates very well what Congress was concerned about when it enacted section 10327. However justified a single delay in the course of these proceedings may have been, the limit has been reached. *See MCI,* 627 F.2d at 340; *Silver-*

*man v. NLRB,* 543 F.2d 428, 430 (2d Cir. 1976).

Sufficient time has elapsed that the Commission has now enunciated broad policy considerations affecting coal rate proceedings in *Ex Parte No. 347 (Sub-1)* and *Ex Parte 411.* These policy considerations can guide the Commission on a "case-by-case" basis, alleviating the effect of the lack of an overall methodology to govern coal rate cases. *See Ex Parte No. 347 (Sub-1),* 46 Fed.Reg. 62,958 (1981). *Cf. MCI,* 627 F.2d at 341–42 (rates need not be perfect, only just and reasonable). Consequently, the lack of a final methodology should pose no problem to proceeding to a final disposition of PEPCO's complaint.

Our order today is for the Commission to reach a final decision in PEPCO's and Conrail's appeal within sixty days of the effective date of our order. It will be the Commission's responsibility to schedule additional submissions from the parties within that time limit, if it deems additional submissions necessary. While the remedy we ordered in *MCI* gave the agency in that case more flexibility to schedule further proceedings, today's order reflects our belief that it is necessary to go further, despite the possible displacement of agency resources or the possible effect on other proceedings. *See Caswell v. Califano,* 583 F.2d 9, 12, 17–18 (1st Cir.1978) (good conscience does not permit further delay despite displacement of agency resources). Yet, at the same time, this order respects the Commission's discretion to have the final say regarding the rate methodology to be applied to PEPCO's complaint, and thus avoids any undue displacement of the Commission's role in deciding the reasonableness of the contested rates.

*It is so ordered.*

## ORDER

PER CURIAM.

Upon consideration of the petitioner's motions for a stay of respondent Commis-

---

**11.** *Cf. Potomac Electric Power Co. v. Consolidated Rail Corp.,* 362 I.C.C. 169, 191 (1980) (suggestion of Commissioner Trantum that contract rates be negotiated). *See generally*

*British Airways Board v. Port Authority,* 564 F.2d 1002, 1010 (2d Cir.1977) (regulatory delay may prevent introduction of new technology).

sion's order dated March 10, 1983 and for clarification and modification of the court's decision of March 1, 1983, and respondents' and intervenor's opposition thereto, it is

ORDERED by the court that

(1) this court's order filed on March 3 is hereby recalled;

(2) the order of the respondent Commission dated March 10, 1983 enforcing the court's decision of March 1, 1983 is hereby stayed; and

(3) the petitioner, respondents, and intervenor are directed to meet with the Chief Staff Counsel of the court to reach an agreement on the amount of time reasonably needed to respond to the coal rate guidelines announced by respondent Commission on February 24, 1983.

### SUPPLEMENTAL OPINION

On March 1, 1983 the court ordered the Interstate Commerce Commission ("Commission") to decide the appeals of Potomac Electric Power Co. ("PEPCO") and Conrail in ICC Docket No. 36114 (Sub No. 1) within sixty days. By an order dated March 10, 1983 the Commission set a deadline of April 6, 1983 for the submission of additional evidence directed to two parts of coal rate guidelines proposed in Ex Parte 347 (Sub No. 1) on February 24, 1983, only five days before the court's decision. PEPCO now moves this court for a stay of the Commission's order of March 10, 1983 and for clarification and modification of this court's March 1, 1983 decision to require the Commission to decide the appeal from the initial decision based on the evidence before it, including the appeal from the initial decision, and the former proposed guidelines for coal rates in Ex Parte 347 (Sub No. 1).

PEPCO is in the awkward position of having received what it requested, Brief for Appellant at 31, and now is seeking a modification of the court's opinion. Still, PEPCO's position has some merit. In the course of these proceedings the Commission has continually shifted its position on the substantive rules to be applied in determining the reasonableness of coal rates. *See Potomac Electric Power Co. v. Consolidated Rail Corp.*, 702 F.2d 1026 at 1028–1030 (D.C. Cir.1983). As the court's March 1 opinion points out, the Commission rejected the methodology utilized by the Administrative Law Judge ("ALJ") in the initial decision and proposed to decide all coal rate proceedings on a " 'case-by-case basis, at least until the remaining issues were resolved.' " *Id.* at 1030. The March 10 order of the Commission appears to frustrate PEPCO's efforts to have the contested rates reviewed by the Commission, as it must now supply new data and analyses to support its complaint.

The state of the record at the time of oral argument, October 14, 1982, suggested that a decision could be reached on the appeal from the initial decision based on existing submissions and supplemental briefings directed at the issues raised by the initial decision. *See* Reply Brief for PEPCO at 8–11. The methodology that appeared to govern the Commission's reasoning was that expressed in Ex Parte 347 (Sub No. 1) (Interim Decision), announced on December 29, 1981. *See* 46 Fed.Reg. 62,958. This December 29, 1981 decision rejected the ton/ton-mile methodology, apparently in favor of the earlier ratio method for allocating expenses. *See* at 1029–1030 & n. 6. ALJ Browning's opinion made clear, however, that submissions were made in the initial proceeding based on *both* the ratio and ton/ton-mile methodology. *See* Initial Decision of ALJ Browning in Docket No. 36114 (Sub No. 1) at 10. Because the record already included submissions utilizing the ratio method, the sixty-day time limit for deciding the appeal seemed attainable, even if some effort would be required to reach a decision within that time.

Five days before the court issued its opinion, however, the Commission announced proposed new guidelines in Ex Parte 347 (Sub No. 1) for determining maximum rates on captive coal traffic. Since PEPCO had asked to be given until April 15, 1983 to respond with new submissions, PEPCO would have little basis for its present motions, had the Commission's March 10 order been confined only to the issues presented

in the original appeal. But the Commission also requested that the parties submit data and responses directed to two of the new guidelines in Ex Parte 347 (Sub No. 1) for determining maximum coal rates—stand-alone costing and management inefficiencies.

The basic question is whether the imposition of entirely new standards is outside the mandate of this court's order in its March 1 opinion. The Commission's position that its order is within the scope of the court's opinion is reasonable. The opinion states "this order respects the Commission's discretion to have the final say regarding the rate methodology to be applied to PEPCO's complaint." At 1035. As the case was presented to this court, this grant of discretion was necessary. What was before the court was the issue of Commission delay, not the appropriateness of the rate methodology to be applied to the rate complaint.

The revocation of the interim standards in Ex Parte 347 (Sub No. 1) makes the central issue in PEPCO's motions the very short timetable for submitting new data in response to the new rate guidelines. Though PEPCO should not be completely surprised by the imposition of these new standards, since it is aware of them from a similar proceeding, *see* Affidavit of Robert Hines at 8–9, the difficulty in responding to the Commission's order seems apparent. In addition, the possibility that new rate methodology might be imposed by the Commission was not unforeseen in the court's opinion. Yet the fact of the new guidelines' existence or their apparent complexity was not known to this court prior to the issuance of the opinion. Instead, the opinion contemplated an uncomplicated process for updating the record. Thus, the court's expectation that the record could simply be updated based on existing submissions indicates that the sixty-day limit previously imposed is no longer an appropriate limit to impose upon the Commission.

PEPCO asks this court to order the Commission to confine itself to the existing record, allowing only for submissions absolutely necessary to decide the appeal on the existing record. This request, however, overlooks the doctrine of primary jurisdiction and the limitations upon this court's power to control matters statutorily relegated to the Commission's discretion. *See* Conrail Response to Emergency Motion at 4. The Commission's primary jurisdiction over rates includes the power to develop methods for determining the reasonableness of rates. Thus, the remedy requested by PEPCO should not be granted.

The only remedy available to the court in the circumstances is to extend the time limit the court imposed on the Commission, even though PEPCO specifically disavows any interest in this relief. The purpose of the sixty-day time limit was to force the Commission to meet its statutory responsibilities to render a decision on PEPCO's appeal. But the strict timetable no longer makes sense, and it would ill serve the parties, the Commission, and the public interest in timely decision-making to force compliance with the previous time limit. The court still expects the Commission to reach a decision in PEPCO's appeal within a reasonable time, but it will not attempt to impose an absolute deadline until the parties have had an opportunity to discuss their respective requirements with Chief Staff Counsel.

*It is so ordered.*