744 F.2d 185
 240 U.S.App.D.C. 170
 POTOMAC ELECTRIC POWER COMPANY, Petitioner,
and
Public Service Commission of the District of Columbia,
Intervenor-Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
and
Consolidated Rail Corporation, Intervenor-Respondent.
 No. 83-1820.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 10, 1984.
Decided Sept. 21, 1984.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 J. Raymond Clark, Washington, D.C., with whom Mary Todd Foldes and Samuel M. Thomasson, Jr., Washington, D.C., were on the brief, for petitioner.
 Lloyd N. Moore, Jr., Washington, D.C., with whom Roberta Willis Sims, Washington, D.C., Acting Gen. Counsel, was on the brief, for intervenor-petitioner, Public Service Com'n of the District of Columbia.
 Timm L. Abendroth, Washington, D.C., with whom John Broadley, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, I.C.C., J. Paul McGrath, Asst. Atty. Gen., John J. Powers III and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 John A. Daily, with whom Paul A. Cunningham, Robert M. Jenkins III, and Marc D. Machlin, Washington, D.C., were on the brief, for intervenor-respondent, Consol. Rail Corp.
 Before HARRY T. EDWARDS, SCALIA and FRIEDMAN,* Circuit Judges.
 Opinion for the Court filed by Circuit Judge FRIEDMAN.
 FRIEDMAN, Circuit Judge:
 
 
 1
 This is another, and hopefully the last, round in the longstanding dispute before the Interstate Commerce Commission (Commission) over the reasonableness of railroad rates charged the petitioner, Potomac Electric Power Company (PEPCO), for the transportation of coal between Pennsylvania and Maryland. In the order under review, the Commission dismissed PEPCO's complaint challenging the rates as unreasonable. We affirm.
 
 
 2
 * A. The Prior Proceedings.
 
 
 3
 The history of the prior Commission and court proceedings is set forth in our most recent opinion involving the matter. Potomac Electric Power Co. v. I.C.C., 702 F.2d 1026, 1028-30 (1983). We restate only as much of that history as is necessary to understand the present case.
 
 
 4
 PEPCO filed its complaint with the Commission against the Penn Central Transportation Co. (to which intervenor-respondent Consolidated Rail Corporation (Conrail) is the successor) in December 1974. The complaint challenged as unjust and unreasonable the rates Penn Central charged PEPCO for transporting coal from mines in Pennsylvania to three of PEPCO's electric generating plants in Maryland.
 
 
 5
 In 1977, the Commission held the rates unreasonable on shipments to one of the three plants, but not unreasonable on shipments to the other two. Potomac Electric Power Co. v. Penn Central Transportation Co., 356 I.C.C. 815 (1977). PEPCO filed with us a petition to review, challenging portions of the decision adverse to it. We vacated the part of the decision that upheld the rates to the two plants, and remanded the case to the Commission for further proceedings not inconsistent with our opinion. Potomac Electric Power Co. v. United States, 584 F.2d 1058 (CADC 1978).
 
 
 6
 Following the remand, the Commission reopened the record, held a new hearing, and then used a series of superseding methodologies for determining the reasonableness of coal rates. See Potomac Electric Power Co. v. I.C.C., 702 F.2d at 1029-30. In February 1981, the administrative law judge, applying then current methodology, filed a decision holding the rates to be unreasonably high. Id. at 1030. Both PEPCO and Conrail appealed the decision to the Commission.
 
 
 7
 The Commission reopened the record for new evidence because it had decided not to adopt the methodology upon which the administrative law judge based his decision. The Commission did not propose any new methodology, and stated that maximum coal rate determinations would involve "case-by-case adjudication at least until remaining issues are resolved." Id.
 
 
 8
 PEPCO then filed with us a petition challenging the Commission's decision to reopen the proceedings. On March 1, 1983, we held that "the Commission has unreasonably delayed disposition of PEPCO's complaint." 702 F.2d at 1028. We ordered the Commission to "reach a final decision in PEPCO's and Conrail's appeal within sixty days of the effective date of our order." Id. at 1035. In so directing, we stated that "[s]ufficient time has elapsed that the Commission has now enunciated broad policy considerations affecting coal rate proceedings," which "can guide the Commission on a 'case-by-case' basis, alleviating the effect of the lack of an overall methodology to govern coal rate cases." We added:
 
 
 9
 Consequently, the lack of a final methodology should pose no problem to proceeding to a final disposition of PEPCO's complaint.
 
 We further stated that
 
 10
 this order respects the Commission's discretion to have the final say regarding the rate methodology to be applied to PEPCO's complaint, and thus avoids any undue displacement of the Commission's role in deciding the reasonableness of the contested rates.
 
 
 11
 Id.
 
 
 12
 Five days before that order, the Commission had proposed a new set of guidelines for determining the reasonableness of coal rates (the 1983 Guidelines, discussed below). On March 10, 1983, the Commission set a deadline of April 6, 1983, for the submission of additional evidence directed to two parts of the new guidelines. Id. at 1036. PEPCO then filed with us a motion for a stay of that order and an order directing the Commission to decide the appeal from the administrative law judge's decision on the evidence then before it, using the former methodology that the administrative law judge had applied.
 
 
 13
 We denied PEPCO's request that the Commission be required to decide the appeal on the existing record. In a supplemental opinion we stated:
 
 
 14
 This request, however, overlooks the doctrine of primary jurisdiction and the limitations upon this court's power to control matters statutorily relegated to the Commission's discretion. The Commission's primary jurisdiction over rates includes the power to develop methods for determining the reasonableness of rates.
 
 
 15
 Id. at 1037 (citation omitted).
 
 
 16
 We concluded that in the circumstances, we should "extend the time limit [we] imposed on the Commission, even though PEPCO specifically disavows any interest in this relief." Id.
 
 
 17
 We subsequently approved the parties' agreement to submit to the Commission "simultaneous filings of further evidence and arguments directed to the new coal rate guidelines" by April 18, 1983 and to file rebuttal evidence by May 2, 1983 "when the evidentiary record in this appeal will be closed." Potomac Electric Power Company v. I.C.C., 705 F.2d 1343, 1343-44 (1983).
 
 
 18
 The parties disagreed over the time the Commission should have to decide the case. PEPCO urged that the Commission should be required to act by June 1, 1983, Conrail proposed either no deadline or 90 days, and the Commission proposed no deadline. We ordered the Commission to decide the appeal by August 1, 1983. Id. at 1344.
 
 
 19
 B. The Pertinent Legislation.
 
 
 20
 The Commission formulated its 1983 Guidelines against the background of two recent statutes governing the regulation of railroad rates.
 
 
 21
 1. In the first of the two statutes, the Railroad Revitalization and Regulatory Reform Act (the 4-R Act), Pub.L. No. 94-210, 90 Stat. 31 (1976), Congress significantly deregulated rates for rail transportation by eliminating Commission jurisdiction over rates on traffic for which the railroad had effective competition. It did this by restricting the Commission's authority to prescribe maximum reasonable rates to traffic on which the carrier had "market dominance," which it defined as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." 90 Stat. at 35, 36, 49 U.S.C. Sec. 10709(a), (b) (1982). "The effect of this provision was to end for most rail service decades of ICC control over maximum rates and to permit carriers not having market dominance to set rates in response to their perception of market conditions." Bessemer and Lake Erie Railroad Co. v. I.C.C., 691 F.2d 1104, 1108 (3d Cir.1982).
 
 
 22
 2. In 1980, Congress enacted the Staggers Rail Act of 1980 (Staggers Act), Pub.L. No. 96-448, 94 Stat. 1895. The conference report on that Act stated that the "over-all purpose is to provide, through financial assistance and freedom from unnecessary regulation, the opportunity for railroads to obtain adequate earnings to restore, maintain and improve their physical facilities while achieving the financial stability of the national rail system." H.R.REP. No. 96-1430, 96th Cong., 2d Sess. 80 (1980), reprinted in 1980 U.S.CODE CONG. & AD.NEWS 3978, 4110, 4111. One of the congressional findings (section 2(9) of the Act) was that "modernization of economic regulation for the railroad industry with a greater reliance on the market-place is essential in order to achieve maximum utilization of railroads to save energy and combat inflation." 94 Stat. at 1896.
 
 
 23
 The congressional declaration of rail transportation policy included: "(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail" and "(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission." Section 101(a), 94 Stat. at 1897, 49 U.S.C. Sec. 10101a (1982). In a section headed "Standards for rates for rail carriers," Congress provided that "[i]n determining whether a rate established by a rail carrier is reasonable for purposes of this section, the Commission shall recognize the policy of this title that rail carriers shall earn adequate revenues, as established by the Commission ...." Section 201(a), 94 Stat. at 1899, 49 U.S.C. Sec. 10701a(b)(3) (1982).
 
 
 24
 In the so-called Long-Cannon amendment in the Act, Congress required the Commission, in determining whether a rate is reasonable, to consider evidence of the following three factors: (i) the amount of traffic transported at revenues that do not contribute to going concern value, and efforts to maximize such traffic; (ii) the amount of traffic that contributes only marginally to fixed costs, and the extent to which rates on that traffic can be changed to maximize revenues from it; and (iii) the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenue. Section 203(a), 94 Stat. at 1904, 49 U.S.C. Sec. 10707a(e)(2)(C) (1982).
 
 
 25
 C. The 1983 Guidelines.
 
 
 26
 The Commission described its 1983 Guidelines as "culminat[ing] our efforts to arrive at a formula for prescribing maximum reasonable coal rates in instances where railroads exercise market dominance over this traffic." Interstate Commerce Commission, Ex Parte No. 347 (Sub. No. 1), Coal Rate Guidelines--Nationwide 2 (February 8, 1983) (footnote omitted) [hereinafter cited as the 1983 Guidelines ], summarized in 48 Fed.Reg. 8362 (February 28, 1983).
 
 
 27
 The Guidelines grew out of an earlier Commission proceeding, begun in 1978, that involved coal rates from the West, which the agency expanded in 1980 to cover all coal rates. In promulgating the 1983 Guidelines, the Commission considered, in addition to the 4-R Act and the Staggers Act, its former criteria for determining the reasonableness of coal rates, its experience with those criteria, and the extensive comments it had received on the problem from rail carriers and shippers (including PEPCO).
 
 
 28
 The key element in the Guidelines was the Commission's adaptation of the principle of "constrained market pricing" as the touchstone for determining the reasonableness of rates on market dominated coal traffic. The Commission stressed that because a railroad has little ability to increase rates on traffic for which it has competition, it may be required to carry such traffic at rates that do not cover its fully distributed costs and therefore that it must make up the difference by charging higher rates on traffic for which it has no competition. The Commission pointed out that in the Staggers Act Congress recognized the need for this system of rates, known as "differential" or "demand based" pricing, if railroads are to achieve the revenue adequacy that Congress intended them to accomplish. It stated:
 
 
 29
 Our regulatory task is to determine the reasonableness of only those rates which are set in an essentially non-competitive market environment. We must develop a means to assure that the rate assessed on this traffic properly reflects the high demand for the service, but is not set at an unreasonably high or "monopoly" level.
 
 
 30
 1983 Guidelines at 9 (footnote omitted).
 
 
 31
 The method the Commission selected to accomplish these objectives was to permit carriers to use "market demand as the basis for their rate-making," subject to the following
 
 
 32
 four upward constraints: (1) the cost of serving that traffic without regard to any other traffic ("stand-alone cost"); (2) certain checks on obviously inefficient management; (3) achievement of revenue adequacy; and (4) phasing of any substantial rate increases.
 
 
 33
 Id. at 10.
 
 
 34
 (Since Conrail is not revenue-adequate and this case involves not rate increases but a challenge to existing rates, constraints (3) and (4) are inapplicable here.)
 
 The Commission stated:
 
 35
 With these constraints in place, carriers would have the necessary incentive to maximize their net revenue contribution from competitive traffic. They would also be effectively limited in the rates they could charge on captive traffic.
 
 
 36
 Id. at 11.
 
 
 37
 The Commission explained "Stand-Alone Cost" as follows:
 
 
 38
 The "stand-alone cost" to any given shipper (or shipper group) is the cost of serving that shipper alone, as if it were isolated from the railroads' other customers. It represents that level at which the shipper could provide the service itself. No shipper would reasonably agree to pay more to a railroad for transportation than it would cost to produce in isolation itself, or more than it would cost a competitor of the railroad to provide the service to it. Thus, the stand-alone cost serves as a surrogate for competition; it enforces a competitive standard on rail rates in the absence of any real competitive alternative.
 
 
 39
 Id. (footnotes omitted).
 
 
 40
 With respect to constraint (2), "checks on obviously inefficient management," the Commission stated:[W]e must consider: (1) the amount of the carrier's traffic that fails to contribute to going concern value and the carrier's efforts to minimize such traffic; (2) the amount of traffic that contributes only marginally to fixed costs and the extent to which rates on such traffic can be raised; and (3) the impact of the proposed rate increase on national energy and the rail transportation policy. 49 U.S.C. 10707a(e)(2)(B). In judging rate reasonableness, we must consider the first two factors listed above and a third factor--the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues. 49 U.S.C. 10707a(e)(2)(C)....
 
 
 41
 * * *
 
 
 42
 * * *
 
 
 43
 If we should determine that in a particular instance any of the foregoing factors have contributed to produce an artifically [sic] high and unreasonable rate, we will act to ensure that captive shippers pay no more than necessary under an efficient market pricing system.
 
 
 44
 Id. at 13-14 (footnote omitted).
 
 
 45
 D. The Commission Decision.
 
 
 46
 In compliance with our order approving the parties' agreement to file by April 18, 1983 "further evidence and arguments directed to the new coal rate guidelines," Conrail on that date filed a lengthy stand-alone cost study, which concluded that the challenged rates were below the cost to PEPCO of itself providing the service. PEPCO filed no stand-alone cost study of its own, but instead argued against the application of the 1983 Guidelines and presented updated revenue and cost data directed to the methodology the administrative law judge had applied in his decision.
 
 
 47
 In its rebuttal case, however, PEPCO submitted a stand-alone cost analysis based upon Conrail's presentation, with a single change. Conrail's analysis assumed that the new theoretical railroad that PEPCO would create could acquire from Amtrak trackage rights over a 71-mile portion of the required route at a rate of 21 cents per mile, the same rate Conrail paid Amtrak for use of that track. In its analysis PEPCO further assumed that it could obtain trackage rights from Conrail and Amtrak for 21 cents per mile over the entire route between Pennsylvania and Maryland. This resulted in a lower cost than Conrail's estimate of building and maintaining a separate railroad line.
 
 
 48
 In its rebuttal case PEPCO also contended that Conrail was inefficiently managed. It relied on two items of evidence: (1) the administrative law judge's finding in his decision that Conrail's deficit from noncompensatory traffic increased between 1977 and 1978, and (2) the testimony on cross-examination in another proceeding by a Conrail vice president of marketing indicating that he was unaware of the exact impact on revenues of certain pricing practices of Conrail.
 
 
 49
 In a lengthy opinion, the Commission concluded that PEPCO had not met its burden of proof that the challenged rates were unreasonable and dismissed the complaint. Potomac Electric Power Co. v. Consolidated Rail Corp., 367 I.C.C. 532 (1983). The Commission held that PEPCO had not met its burden of proof with respect to either "the stand-alone cost of providing [the] service" or "the Long-Cannon factors, including whether defendant, Conrail, is inefficiently managed and whether (and to what extent) such alleged inefficiencies led to revenue inadequacy. In short, PEPCO has not met its burden of proof in spite of clear notice as to what was required." Id. at 533.
 
 The Commission stated:
 
 50
 In this proceeding, we have decided to rely on our proposed 1983 Guidelines, which, as here pertinent, are based on the stand-alone cost methodology and the Long-Cannon factors. These guidelines represent our best and most recent thinking, and reflect several years of experience and consideration of the issue and the wide-ranging comments received on our several proposals, as well as on changes that have occurred in the rail industry and its pricing mechanisms.
 
 
 51
 Id. at 535.
 
 
 52
 After explaining the 1983 Guidelines and their background, the Commission discussed at length and rejected PEPCO's objection to the use of the Guidelines, PEPCO's own stand-alone cost analysis, and PEPCO's argument that under the Long-Cannon factors the challenged rates were unreasonable because Conrail was inefficiently managed. We discuss these arguments in detail in the remainder of our opinion.
 
 II
 
 53
 In addition to its substantive challenges to the Commission's decision, which we discuss in parts III and IV below, PEPCO argues that the Commission improperly applied the 1983 Guidelines because (A) the Guidelines are not final; (B) the Commission singled out PEPCO for disparate treatment by applying the Guidelines only in PEPCO's case but not in any other pending coal rate case; (C) it was unfair to PEPCO for the Commission to change its methodology during the case; (D) PEPCO did not have sufficient time to prepare its own stand-alone cost study; and (E) PEPCO was denied the information it needed to show that Conrail was inefficiently operated.
 
 
 54
 A. The fact that the Guidelines were not final did not preclude the Commission from applying them in this case. As the Commission explained, it relied on the Guidelines because they "represent our best and most recent thinking" and reflected the Commission's "several years of experience and consideration of the issues" and the "wide-ranging comments" the agency had received on its "several proposals." 367 I.C.C. at 535. The Commission cannot be faulted for deciding the case upon the most persuasive analysis then available to it.
 
 
 55
 Moreover, in our March 1, 1983 decision, we recognized that "the lack of a final methodology should pose no problem to proceeding to a final disposition of PEPCO's complaint." 702 F.2d at 1035. In our supplemental opinion in that case, we approved the parties' agreement to submit by specified dates "further evidence and arguments directed to the new coal rate guidelines." 705 F.2d at 1343. We understood and anticipated that, despite the nonfinal character of the new Guidelines, the Commission would apply them in deciding this case.
 
 
 56
 B. The Commission did not improperly single out PEPCO's case as the only one in which to apply the proposed Guidelines. PEPCO relies upon San Antonio, Texas v. Burlington Northern Railroad Co., I.C.C. Docket No. 36180, et al., order of Oct. 11, 1983, in which the Commission granted requests to hold certain coal rate proceedings in abeyance until the final guidelines had been adopted. In that decision, however, the Commission explained that it was taking that action because in those cases, unlike the present case, the Commission was not under any court-imposed time deadlines for decision. In its brief in this court, the government has stated, and PEPCO has not denied, that following that decision the Commission "has decided to proceed in several of the cases without waiting for final guidelines ... where parties have urged the Commission to do so."
 
 
 57
 Since, as explained above, it was PEPCO that insisted upon expediting the Commission's decision, PEPCO cannot now complain that because of the court-imposed deadlines it obtained, the Commission could not suspend PEPCO's case until the Guidelines became final. If PEPCO wanted such suspension, it could have requested us to extend or terminate the Commission's deadline for a decision.
 
 
 58
 C. The Commission was warranted in changing its methodology while these proceedings were pending. The history of the Commission's attempts to devise an appropriate methodology for determining the reasonableness of coal rates has been a process of trial and error in which the Commission changed its standards in the light of accumulating knowledge and experience. Nothing in the Interstate Commerce Act or general principles of administrative law required the Commission to adhere to standards that had proven unsound or unreasonable or barred the agency from applying its "best and most recent thinking, reflecting several years of experience and consideration of the issue" in deciding this particular case at this particular time. 367 I.C.C. at 535.
 
 
 59
 Such flexibility in rate-making reflects an appropriate exercise of the Commission's broad discretion to "alter its past interpretation and overturn past administrative rulings and practice" in response to "changing needs and patterns of transportation." American Trucking Association v. Atchison, Topeka & Santa Fe Railway Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). Moreover, in our March 1, 1983 decision, we noted the shift in the Commission's methodology, but nevertheless approved the Commission's proposed application of the 1983 Guidelines in deciding this case.
 
 
 60
 Contrary to PEPCO's contention, we do not read the legislative history of the Staggers Act as requiring the Commission to apply in rate cases the "existing law" in effect when that Act was enacted. As we have recognized, the Commission has substantial discretion to select the method and basis by which it will determine the reasonableness of coal rates. The Staggers Act did not limit the Commission's discretion so as to bar the agency from considering different methodologies than those it was using when that Act became effective.
 
 
 61
 D. PEPCO has not shown that it was denied sufficient time to prepare a stand-alone cost analysis. As the Commission pointed out, Conrail prepared an extensive stand-alone cost analysis in 6 weeks, the time period for submitting such a study to which the parties had agreed. 367 I.C.C. at 548-49. If PEPCO had required more time to prepare such a study, it could have requested it. PEPCO made no attempt to submit such a study, as it had been told and had undertaken to do. On the day on which its submission of "further evidence and arguments directed to the new coal rate guidelines" was due, PEPCO's submission merely repeated its contention that its case should be decided not under those guidelines but under the superseded earlier standards the administrative law judge had applied.
 
 
 62
 E. PEPCO's contention that it was denied the information it needed to show that Conrail was inefficiently operated does not withstand analysis. The argument rests upon PEPCO's unsuccessful attempt in another Commission proceeding to obtain information from Conrail. PEPCO asserts that because in that proceeding the Commission refused to compel discovery, it would have been "futile" for PEPCO to have made a similar request here.
 
 
 63
 The short answer is that PEPCO did not seek discovery here. If it had done so, we cannot say what the result would have been. Cf. United States v. Tucker Truck Lines, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). PEPCO cannot properly complain because it did not receive information it did not attempt to obtain through the procedures available to it. Moreover, as the Commission pointed out, "PEPCO cannot be heard to complain of time constraints in light of its repeated efforts to expedite the proceeding with full knowledge of what its burden would be." 367 I.C.C. at 556.
 
 III
 
 64
 A. PEPCO and the intervenor Public Service Commission of the District of Columbia contend that the Commission's use of the stand-alone cost concept in deciding PEPCO's challenge to the reasonableness of Conrail's coal rates was an impermissible rate-making methodology.
 
 
 65
 PEPCO argues that the Commission's use of stand-alone cost is inconsistent with the Staggers Act and other provisions of the Interstate Commerce Act that require the Commission to determine whether rates are reasonable. PEPCO contends that the Commission gave undue and improper weight to the congressional policy reflected in the 4-R and Staggers Acts that railroad rates must produce sufficient revenue to make the carriers self-sufficient. According to PEPCO, in those statutes Congress intended the Commission to base its decision on the reasonableness of Conrail's coal rate upon an analysis of Conrail's fully allocated cost of providing the particular service and left no room for the methodology the Commission used.
 
 
 66
 This court has recognized that the 4-R Act permitted differential pricing under which "some rates [are] set at a level exceeding fully allocated costs in order to compensate for those rates which must be set at less than fully allocated costs to meet competition from other transportation modes," since this method of rate-making "is pertinent to the objective of providing an adequate over-all level of earnings." Houston Lighting & Power Co. v. United States, 606 F.2d 1131, 1148 (1979); San Antonio, Texas v. United States, 631 F.2d 831, 852 (D.C.Cir.1980).
 
 
 67
 In enacting the Staggers Act, Congress "unders[tood] the necessity of such differential pricing," since "[b]ecause of the existence of competition, all rates cannot pay an equal percentage of 'fixed costs.' " H.R.REP. NO. 1035, 96th Cong., 2d Sess. 39, reprinted in 1980 U.S.CODE CONG. & AD.NEWS 3978, 3984. "[N]ot all traffic can be transported at fully allocated cost level due to competitive considerations ...." S.REP. NO. 96-470, 76th Cong., 1st Sess. 7 (1980).
 
 
 68
 We conclude that the Commission's use of stand-alone cost in determining the reasonableness of the rates of a railroad with inadequate revenues (as Conrail was) for noncompetitive traffic is an appropriate implementation of differential pricing. Congress enacted the Staggers Act because of concern that the 4-R Act "has not provided the flexibility that the industry needs to earn revenues sufficient to maintain and improve the rail system." H.R.REP. NO. 1035 at 38, 1980 U.S.CODE CONG. & AD.NEWS at 3983. In the words of the conference committee, the "overall purpose" of the Staggers Act was "to provide, through financial assistance and freedom from unnecessary regulation, the opportunity for railroads to obtain adequate earnings ...." H.R.REP. NO. 1430 at 80, 1980 U.S.CODE CONG. & AD.NEWS at 4111.
 
 
 69
 Since under differential pricing a railroad must be able to charge enough on the traffic for which it has no competition to compensate it for its inability to earn its fully allocated costs on traffic where it has competition, the problem is to determine the point at which the rates on the noncompetitive traffic are unreasonably high. These rates necessarily must exceed fully allocated costs if the carrier is to earn adequate revenue. As the Commission explained in this case:
 
 
 70
 [T]he stand-alone cost to a given shipper, is the cost of serving that shipper (or possibly group of captive shippers) as if the railroad had no other customers using the subject facilities. In the absence of competitive alternatives, so long as the railroad's rate is less than the cost to the shipper of providing the service for itself, it is economically advantageous to the shipper to use the carrier's service. Moreover, a rate below stand-alone cost ensures the shipper that it is not cross-subsidizing the rate of other shippers. In other words, the shipper is not paying for facilities or services that it does not use. In fact, if the shipper is paying less than the full stand-alone cost of the service, it is benefitting from certain economies of scale or other cost-sharing activities that allow the carrier to charge a lower rate.
 
 
 71
 367 I.C.C. at 541-42.
 
 
 72
 In other words, as long as the challenged rate has not been shown to exceed what it would cost the shipper itself to provide the service, the rate is reasonable because it (1) enables the carrier to maximize its earnings, while at the same time (2) protects the shipper from monopoly pricing in which the carrier sets its rates without regard to competition. Although stand-alone pricing deals with hypothetical and not actual transportation situations, it provides an appropriate analytical tool for determining whether a return on noncompetitive traffic "properly reflects the high demand for the service, but is not set at an unreasonably high or 'monopoly' level." 1983 Guidelines at 9.
 
 
 73
 PEPCO and the Public Service Commission of the District of Columbia argue that since stand-alone cost applies only in situations where the railroad has no competition for the traffic, it enables the carrier to maximize "monopoly profits." The concept of differential pricing, however, necessarily contemplates that the carrier will maximize its profits on traffic for which it has no competition so as to offset its lower earnings on competitive traffic. It does not aid analysis to describe a carrier's rate on noncompetitive traffic pejoratively as producing "monopoly profits."
 
 
 74
 The question is whether these rates, although noncompetitive, are reasonable. As the Commission pointed out in its Guidelines "the stand-alone costs serve as a surrogate for competition; it enforces a competitive standard on rail rates in the absence of any real competitive alternative."
 
 
 75
 Furthermore, stand-alone cost is not the only ceiling on rates. In addition, a rate that exceeds stand-alone cost may be held unreasonable if the carrier is not efficiently operated, or if either of the two other constraints (not applicable in this case, see p. 189, supra ) come into play.
 
 
 76
 B. Alternatively, PEPCO argues that if a stand-alone cost approach is permissible, the Commission erred in rejecting PEPCO's stand-alone cost analysis. As noted, that analysis did not provide any data that PEPCO itself developed. Instead, as PEPCO explained in its brief, it merely took Conrail's study and changed it "only in extending the traffic rights operations over the entire route of movement of the hypothetical railroad."
 
 
 77
 PEPCO's stand-alone cost study assumed that the hypothetical railroad could obtain, at the same rate of 21 cents per mile that Conrail pays Amtrak, not only the right from Amtrak to move its cars over the 71 miles of Amtrak line that Conrail now uses in moving the PEPCO shipments, but also similar rights from Conrail over all other portions of the hypothetical route. Under PEPCO's analysis the stand-alone cost was less than the existing Conrail rates.
 
 
 78
 Assuming that PEPCO's submission complied with each party's agreement initially to submit evidence relating to the stand-alone cost theory in the 1983 Guidelines, the Commission justifiably rejected it as fatally flawed. As the Commission explained, there was
 
 
 79
 [no] reason to expect Conrail to make PEPCO such an offer or any offer for trackage rights that is more favorable to PEPCO than the rate itself.... In addition, the 21 cents per mile figure is based on the "avoidable cost" to Amtrak of allowing Conrail to use that particular section of track.
 
 
 80
 * * *
 
 
 81
 * * *
 
 
 82
 PEPCO's stand-alone costs represents the minimum compensation to prevent out-of-pocket losses to Conrail. A rate based on such a computation is not even fully compensatory and is wholly inconsistent with differential pricing and our policy of placing greater reliance on the market in setting rates.
 
 
 83
 367 I.C.C. at 552-53.
 
 
 84
 Although PEPCO criticized Conrail's stand-alone cost study, the Commission found it unnecessary to evaluate that study because PEPCO "failed to produce its own estimate of stand-alone cost to counter Conrail's estimates." The Commission concluded on this aspect of the case: "Since PEPCO has failed to show that Conrail's rates exceed the stand-alone cost of service, under any definition of stand-alone cost, we cannot find Conrail's rates unreasonable per se." Id. at 553 (emphasis in original).
 
 
 85
 In our earlier opinion in this case, we recognized "the Commission's discretion to have the final say regarding the rate methodology to be applied to PEPCO's complaint ...." 702 F.2d at 1035. We cannot say that, in applying the stand-alone cost analysis to conclude that PEPCO had failed to carry its admitted burden of proof that Conrail's coal rates were unreasonable, the Commission abused its discretion.
 
 IV
 
 86
 The Long-Cannon amendment of the Staggers Act provides in pertinent part as follows:
 
 
 87
 (C) In determining whether a rate is reasonable, the Commission shall consider, among other factors, evidence of the following:
 
 
 88
 (i) the amount of traffic which is transported at revenues which do not contribute to going concern value and efforts made to minimize such traffic;
 
 
 89
 (ii) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and
 
 
 90
 (iii) the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues.
 
 
 91
 Section 203(a), 94 Stat. 1904, 49 U.S.C. Sec. 10707a(e)(2)(C) (1982).
 
 
 92
 In its 1983 Guidelines, the Commission described these criteria as "certain checks on obviously inefficient management." In its decision in this case, the Commission explained:
 
 
 93
 In considering management efficiency, we look both at a carrier's operating practices and its pricing structure. We stated [in the Guidelines] that we would examine the carrier's mix of traffic and would not permit one shipper or commodity to bear an undue portion of the carrier's revenue need.
 
 
 94
 367 I.C.C. at 542.
 
 
 95
 In this case the Commission followed its ruling in Arkansas Power & Light Co., 365 I.C.C. 983, 999 (1982), affirmed on other issues, Arkansas Power & Light Co. v. I.C.C., 725 F.2d 716 (D.C.Cir.1984), that
 
 
 96
 [t]he complainant bears the burden of proof in a complaint proceeding. Accordingly, it is appropriate that the complainant initially come forward with evidence of the Long-Cannon factors. When the complainant produces relevant evidence, the carrier will have the opportunity to rebut. We will then weigh and discuss the evidence in our decision. If complainant fails to introduce relevant evidence, we will not require the carrier to make up for the deficiency.
 
 
 97
 365 I.C.C. at 999.
 
 
 98
 Upon reviewing the evidence relating to the Long-Cannon factors upon which PEPCO relied, the Commission concluded that "PEPCO presented no persuasive evidence that Conrail is inefficiently managed, and has not met its burden of proof on this issue." 367 I.C.C. at 557.
 
 
 99
 A. PEPCO's argument that Conrail was inefficiently managed, so that under the Long-Cannon factors the coal rates were unreasonable, rested upon two items: (1) the finding of the administrative law judge that "[e]ven granting the fact that Conrail's management has spared no effort to maximize gross revenues, ... Conrail experienced an increase in deficit below variable costs from noncompensatory traffic of from approximately $117 million in 1977 to $277 million in 1978" (id. at 555); and (2) the fact that in his testimony in another case, Conrail's vice president in charge of marketing was unable to state whether a past reduction in certain rates improved Conrail's revenues or on cross-examination to recall the net revenue contribution of Conrail traffic that moved under contract rates.
 
 
 100
 We agree with the Commission that this evidence did not indicate that Conrail was inefficiently managed.
 
 
 101
 The Commission properly held that the administrative law judge's finding was not probative of Conrail's efficiency because that finding "was based on the mistaken assumption that any traffic contribution less than 100% of all variable costs is noncompensatory." 367 I.C.C. at 556. The Commission pointed out that under the Staggers Act (49 U.S.C. Sec. 10701a(c)(2)), a rate that "equals or exceeds the variable cost of providing the transportation is conclusively presumed to contribute to the [railroad's] going concern value"; that the Commission had adopted the term " 'directly variable costs' (DVC)," which it "defined to include only those cost elements that vary directly with the level of service provided under the rate"; and that "[s]ince DVC is not equal to Rail Form A variable costs [upon which the administrative law judge based his conclusion], which always include many more cost elements, traffic which moves at a rate less than Rail Form A variable costs can still contribute to the carrier's going concern value and be compensatory." Id. at 557.
 
 
 102
 PEPCO's reliance upon the two instances in another case in which, while testifying, Conrail's vice president was unable to recall information about the effect upon Conrail's revenues of certain rates did not show or even suggest that Conrail was inefficiently managed. Although those instances might have had some relevance in determining the weight to be given his testimony in that case, they shed no light on the broader issue here involved whether Conrail was efficiently managed.
 
 
 103
 In point II-E, supra, we considered and rejected PEPCO's further argument that it was denied the opportunity to obtain additional information relating to Conrail's alleged inefficient management. The present case thus does not present the situation that concerned us in Arkansas Power & Light Co., 725 F.2d at 724, of a complainant who was unable to present evidence on the Long-Cannon factors because of the limited discovery the Commission permitted.
 
 
 104
 B. PEPCO also contends that the Commission committed reversible error because it failed to discuss specifically each of the three Long-Cannon factors. The Long-Cannon amendment, however, does not require the Commission to consider those factors, but only to consider "evidence" of them.
 
 
 105
 Under the Staggers Act, PEPCO, as the shipper in this complaint proceeding, had the "burden of proving" that the challenged "rate is not reasonable." 49 U.S.C. Sec. 10701a(b)(2). As the Commission held and PEPCO conceded, that burden covered evidence relating to the Long-Cannon factors as well as stand-alone costs, since under the 1983 Guidelines those standards provide alternative grounds upon which a rate may be held unreasonable. 367 I.C.C. at 541.
 
 
 106
 In the present case, the evidence upon which PEPCO relies under the Long-Cannon factors did not address any of those factors but only the broader question whether Conrail was efficiently operated. The latter question is the ultimate issue to which, under the Commission's 1983 Guidelines, the Long-Cannon factors relate. As we have noted, this evidence fell far short of sustaining PEPCO's burden of proving that Conrail is inefficiently operated. To the extent that this evidence is viewed as relating to the Long-Cannon factors themselves, the Commission "considered" it but found it unpersuasive.
 
 
 107
 In the absence of any evidence in a complaint proceeding directly relating to the Long-Cannon factors, the Commission was not required itself to seek out or obtain such evidence. In a complaint proceeding, the Commission acts as a quasi-judicial tribunal and must decide the case on the basis of the evidence presented to it. In this case PEPCO was the complainant, but it failed to introduce any significant evidence under the Long-Cannon factors. The Commission did not improperly ignore those factors in dismissing PEPCO's complaint for failure to carry the burden of proof that the challenged Conrail coal rates were unreasonable.
 
 
 108
 The order of the Interstate Commerce Commission dismissing PEPCO's complaint is
 
 
 109
 Affirmed.
 
 
 
 *
 United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 291(a)