Congressman Charles G.
ROSE, Plaintiff,

v.

FEDERAL ELECTION COMMISSION,
et al., Defendants.

Civ. A. No. 84–2278.

United States District Court,
District of Columbia.

Oct. 15, 1984 as Corrected Oct. 16
and 17, 1984.

On Motion for Reconsideration Oct. 31,
1984 as Corrected April 30, 1985.

Order Vacating Protective Order and
Lifting Seal Jan. 31, 1985.

William C. Oldaker, Jane M. Kramer, Epstein Becker Borsody & Green, P.C., Washington, D.C., for plaintiff.

Charles N. Steele, Gen. Counsel, Richard B. Bader, Asst. Gen. Counsel, Robert E. Pease, Atty., Federal Election Com'n, Washington, D.C., for FEC.

Brice M. Clagett, John R. Bolton, Daniel A. Rowley, Covington & Burling, Washington, D.C., for amici curiae, Nat. Congressional Club and Jefferson Marketing, Inc.

OBERDORFER, District Judge.

This Federal Election Act dispute is before the Court on cross-motions for summary judgment. On October 4, 1984, the Court entered an Order granting plaintiff's motion, and requiring the Federal Election Commission ("FEC" or "Commission") to determine by October 19, 1984, whether or not there was probable cause to believe that certain persons being investigated by the Commission had violated federal election laws or show cause why it had failed to make such a determination. The Order referred to a separate memorandum to be filed. This is that memorandum.

## I.

This complaint, filed July 24, 1984, by North Carolina Congressman Charles G.

Rose[1] against the FEC, is a sequel to another complaint filed in this Court by the same plaintiff against the same defendant on June 13, 1983. That original complaint, like the instant one, sought a declaratory judgment and injunctive relief on account of the Commission's alleged failure to take action on a letter/complaint which Congressman Rose filed with FEC on October 29, 1982. That letter/complaint charged that Jefferson Marketing, Inc. (Jefferson) had, in violation of the Federal Election Campaign Act, contributed services which produced a television advertisement used by a candidate in the Democratic primary and later, with slight modification, by the Republican candidate in the general election for Congressman from the 7th District of North Carolina. The letter/complaint also charged that a campaign committee for the Democratic primary candidate had made an illegal contribution in kind to the Republican candidate in the general election. In addition, the letter/complaint charged that the Democratic candidate in the primary had made an illegal personal contribution. Finally, the letter/complaint charged that Jefferson was a subsidiary of the National Congressional Club Committee (Congressional) and that Congressional had failed to report its subsidiary's activities to the FEC, as required by law.

According to the Commission's undisputed statement of facts under seal,[2] the FEC, on November 2, 1982, notified Jefferson of the complaint and of its opportunity to respond and to show cause why the Commission should take no action. Jefferson's subsequent response was deemed by the Commission to be insufficient to resolve the allegations. On May 3, 1983, the Commission, following the April 21, 1983 recommendation of its General Counsel, found reason to believe that Jefferson and others had violated the Act. On May 24, 1983, the Commission approved, and on June 2 issued, subpoenas for depositions and production of documents. On June 13, 1983, Congressman Rose filed the original complaint in this Court alleging that the Commission's failure to take final action on his 1982 complaint was contrary to law. On July 8, 1983, Jefferson and Congressional responded to the subpoenas for the production of documents. On July 27, 1983, the Office of the General Counsel submitted to the Commission a Comprehensive Investigative Report. On September 8, 1983, respondents filed supplemental responses to the subpoenas for production of documents. During the week of September 12, 1983, the Commission's legal staff deposed seven representatives of respondents including the president of Jefferson and the treasurer of Congressional.

On November 29, 1983, the Commission approved twenty pages of interrogatories for Jefferson and Congressional. On January 16, 1984, respondents replied to the Commission's interrogatories. According to the Commission, respondents did not answer some questions and did not fully answer others. Consequently, on January 31, 1984, the Commission approved the recommendation of its General Counsel and authorized the filing of a civil suit to enforce its subpoenas and compel complete responses to the interrogatories. On February 15, 1984, that suit was filed in the federal court in North Carolina. Thereupon Congressman Rose, the plaintiff here, dismissed his first suit in this Court, without prejudice.[3]

On April 10 and 11, 1984, Jefferson and Congressional answered the interrogatories in accordance with a settlement agreement negotiated between the respondents and the FEC. A few days later the Commis-

1. Congressman Rose was a candidate for election in 1982 and is a candidate for reelection in 1984. Transcript of Proceedings Hearing of October 4, 1984 at 72 (hereinafter "Transcript").

2. Since the passage of time is an essential component of this dispute, a detailed chronology must be considered. For a fuller version such a

chronology, *see* Federal Election Commission's Statement of Material Facts as to which there is No Genuine Dispute, Submitted Under Seal.

3. The Stipulation of Dismissal and Order indicated that Congressman Rose dismissed his suit here "in light of the Commission's petition ... to enforce subpoenas."

sion dismissed the North Carolina enforcement suit, without prejudice.

On April 26, 1984, after the answers to the subpoenas and the interrogatories, the Commission received from a Raleigh, North Carolina newspaper an 84-page package of internal Jefferson and Congressional documents which the newspaper had received from an anonymous source. On May 7, 1984, counsel for plaintiff submitted further evidence and information relevant to plaintiff's October 1982 complaint. On May 14, 1984, the Commission rejected an April 20 request from Jefferson and Congressional to return to them the documents received by the Commission from the newspaper.

According to docket entries in this Court, on July 24, 1984, Congressman Rose filed the complaint now before this Court. On July 31, 1984, Jefferson filed a motion to intervene either as a matter of right or voluntarily together with an answer to the July 24 complaint. The memorandum filed by Jefferson in support of that motion referred to the Commission's disclosure of what Jefferson described as its "confidential documents and confidential discovery materials" (i.e., trade secrets and business records), and the terms of the settlement of the North Carolina enforcement proceeding whereby the Commission promised to notify Jefferson five days in advance of any further such disclosure.[4] It sought intervention here to assure the Commission's compliance with that agreement.

Meanwhile, on August 22, 1984, the Commission's General Counsel submitted to Jefferson and Congressional, in accordance with Commission procedure, a brief recommending that the Commission find probable cause that Jefferson and Congressional had violated federal election laws.

On August 24, 1984, Jefferson moved in this Court to dismiss without prejudice its motion to intervene reciting an agreement by the Commission not to submit Jeffer-

son's documents to the court without five days notice to Jefferson.

On August 27, 1984, reciting that it had filed its original letter/complaint with the Commission on October 29, 1982, plaintiff filed a motion in this Court to set a hearing during the three days beginning October 2, 1984. In a September 6 response, the Commission's counsel took the position that the hearing requested by plaintiff be "for the limited purpose of setting a reasonable briefing schedule." On September 13, 1984, plaintiff moved for summary judgment. On September 14, 1984, the Court set "a hearing of this action" for October 4, 1984. A September 18, 1984 Order granted Jefferson's motion to dismiss its motion to intervene, without prejudice.

Meanwhile, on September 21, 1984, plaintiff moved to place its summary judgment motion on the agenda for the October 4 hearing. On September 24, 1984, the Commission filed, in response to plaintiff's motion for summary judgment, a cross-motion for summary judgment supported by a very helpful statement of material facts. In apparent deference to the North Carolina stipulation as extended by the agreement in connection with dismissal of the motion to intervene, the Commission filed its statement under seal. On September 24, 1984, the parties stipulated and the Court entered a Protective Order limiting use of documents from the Commission's administrative record to counsel and requiring their filing under seal. On September 27, 1984, with the parties' briefs before it and the plaintiff's motion for summary judgment ripe for decision, the Court filed an order scheduling a hearing on October 4, 1984 on the plaintiff's motion for summary judgment.

On September 21, 1984, in addition, Jefferson responded in the proceedings before the Commission to the brief filed there by the Commission's General Counsel.[5]

---

4. *See Federal Election Commission v. Jefferson Marketing, Inc., et al.*, Stipulation and Order, Civil Action No. 84-29, Misc. 5 (E.D.N.C. Mar. 27, 1984), attached as Exhibit C to Motion of

Jefferson Marketing, Inc. to Intervene in this District of Columbia case.

5. Jefferson had sought two 15-day extensions of time in which to file that brief. The Commis-

On October 3, 1984, Jefferson filed a motion not to be excluded from hearing in this Court on the cross-motions for summary judgment. The motion referred to the Commission's desire to exclude the public from the hearing. According to Jefferson, such a ruling was necessary to implement the Protective Order "so that no public disclosure will be made of any information pertaining to the investigation without Jefferson's consent." Motion of Jefferson Marketing, Inc. Not to be Excluded from Hearings at 2.

On October 3, 1984, counsel for the Commission advised the Court's staff that no representative of the Commission could attend the hearing because the Office of Management and Budget had directed all "non essential" branches of the government to close for lack of funds; Congress had failed to appropriate funds for the fiscal year 1985.[6] The Court, through staff, advised counsel that he should understand that if the Commission failed to appear the Court would entertain a motion for judgment by default. Transcript at 2–4.

On October 4, 1984, counsel for the Commission appeared and the Court conducted a hearing on the cross-motions for summary judgment. The logistics of the hearing were somewhat complicated by the Protective Order and the apparent intention of Congress to shield from the public the preliminaries of an election law enforcement proceeding. Nevertheless, the Court invited Jefferson to renew its motion to intervene (with the admonition that if it intervened it might become vulnerable to any equitable relief afforded to the plaintiff). When Jefferson's counsel again elected not to intervene, the Court *sua sponte* recognized Jefferson and its counsel as *amicus curiae* and accorded them full opportunity to argue proposed orders and otherwise

participate. *See* Transcript at 69ff. In addition, to honor the Protective Order, part of the hearing was conducted at the bench with the transcript of those portions of the hearing filed under seal.[7] In a colloquy at that hearing, the Commission's counsel indicated that he was unable to state whether the Commission would or would not act by election day this year. Transcript at 51.

## II.

■ In 2 U.S.C. § 437d(a)(9) Congress specifically empowered the Commission "to conduct investigations ... *expeditiously,* to encourage voluntary compliance, and to report apparent violations to the appropriate law enforcement authorities" (emphasis added). The foregoing chronology suggests that the Commission has had more than enough time and more than enough information to investigate plaintiff's 1982 charges "expeditiously" and to decide pursuant to 2 U.S.C. § 437g(a)(4)(A)(i) well before the 1984 election whether there is probable cause to believe that any person has violated the federal election laws as alleged by the plaintiff on October 29, 1982.

The standards for determining whether the FEC's failure to act on any given complaint is contrary to law have been set out in *Common Cause v. Federal Election Commission,* 489 F.Supp. 738 (D.D.C. 1980). In that case, Judge Parker indicated that the factors a court should consider in making this determination include:

> the credibility of the allegation, the nature of the threat posed, the resources available to the agency, and the information available to it, as well as the novelty of the issues involved.

*Id.* at 744. The FEC itself concedes, in its memorandum on the cross-motions for

---

sion granted one such extension and denied the other.

6. Congress in 2 U.S.C. § 437d(d) requires the Commission to send Congress a copy of any budget request and any legislative proposals which the Commission sends to the President or the Office of Management and Budget, suggest-

ing that Congress considers the Commission to be relatively independent of OMB control.

7. The Court endeavored to summarize in open court, to the extent possible in accordance with the Protective Order, the substance of the colloquies at the bench.

**6**

summary judgment, that "[t]he allegations made by the plaintiff in his administrative complaint were credible." Defendant's Memorandum at 11. The FEC also concedes that "[t]he nature of the threat posed by this case is significant." *Id.* As for the resources available to the agency, counsel for the FEC conceded at the hearing on this matter that there is currently no staff deficiency that would impair its ability to act on the complaint at this time. Transcript at 44. The FEC also states that it "has accumulated a large amount of evidence in this case," Defendant's Memorandum at 12, and nowhere has claimed that any additional evidence is necessary for it to be able to reach a final determination. Finally, the FEC states that "the issues raised in this case were both novel and complex." *Id.* At the same time, though, the FEC has had the benefit of two years in which to consider those issues, and nowhere has the FEC represented that the novelty of the issues remains an obstacle to their resolution. It may be that the Commission's failure to act before now is caused in part by such factors as the resistance of Jefferson and others to the Commission's discovery process. But whatever the reason, the chronology of events in this matter indicates that if this 1982 election matter had been investigated "expeditiously," it could have been resolved before the 1984 election.

The enforcement provisions of the statute are studded with short deadlines evidencing Congress's expectation that the Commission would exercise with good speed its power to investigate and conduct hearings expeditiously, encourage voluntary compliance and report apparent violations for specific enforcement. Section 437g(a) allows the Commission only *five* days after receipt of a complaint to notify the person charged about the complaint. The person notified has only *fifteen* days in which to respond. The Commission has only 120 days during which it is immune

from challenge that its handling of the matter has been too slow; the statute flatly states that thereafter, any FEC complainant is free to file suit in federal district court to seek to enforce the statute's insistence on expedition. When the Commission determines that it has reason to believe that a person is about to commit or has committed a violation and has so notified that person, the respondent must answer within 15 days. The need for good speed is a corollary to the further requirement that the Commission must usually allow only 30 days, and cannot allow more than 90 days, for conciliation before referring its probable cause finding to law enforcement authorities. Most significantly here, Title 2 U.S.C. § 437g(a)(4)(A)(ii)—with an eye to the imminence of an election—authorizes the Commission to reduce the conciliation period to 15 days if its determination of probable cause has been made within 45 days preceding an election.

■ All of these short deadlines reflect Congress's intention that the Commission generally act expeditiously and, in any event, if reasonably possible, before the next election. It is a "necessary implication" of the statute that if the example of this record had been before the drafters they would have agreed that the Commission should not allow plaintiff's October 1982 charges to go unresolved until after the 1984 election.[8]

■ Nor does the failure of the statute to say this explicitly mean that the Commission's failure to act is in compliance with the law. It is inconceivable that Congress could have anticipated that a complaint by a presidential candidate running for re-election four years later, or a complaint by a senatorial candidate running for re-election six years later, would remain unresolved by the time of the next election. Under the Constitution, the term of a member of Congress is two years. The House of Representatives exists two years at a

8. *See NAACP v. Civiletti,* 609 F.2d 514, 516–17 (D.C.Cir.1979) ("statutory authorization may be inferred by necessary implication from the statutory context in which a fee provision arises"), *cert. denied,* 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1114 (1980); 2A *Sutherland Statutory Construction* at § 55.03 (4th ed. 1973).

time. From the perspective of congressional elections, two years are a lifetime.

It is too obvious to expect the drafters to have spelled out that they enacted the Federal Election Campaign Act and created the FEC with a view that they both would be effective. The draftsman manifestly did not contemplate that the short 5 to 15 and 30 to 90 day deadlines that they imposed on the Commission and on the judicial review procedures designed by the Act could be administered so as to prevent the Commission from acting on a complaint filed before the 1982 congressional election until after the 1984 election.[9]

In holding that the FEC has acted contrary to law in failing to take action by the eve of the 1984 elections, it is not necessary to determine whether the FEC is absolutely required to resolve every complaint before it within the two-year period until the next following election. Yet the presumption that this will occur is strong. Not only is such expedition plainly within the contemplation of the statutory scheme, but the occurrence of a subsequent election has been an omnibrooding factor in the considerations of other courts in similar cases. In *Common Cause, supra* —a decision rendered in April of 1980 which involved the FEC's failure to act on complaints filed with it in June of 1978—Judge Parker did not need to reach the question of whether the failure to act prior to a successive election is contrary to law because most of the complaints had already been resolved by conciliation agreements and agreements as to the remaining complaints were "anticipated almost immediately." *Id.* at 744. However, Judge Parker flatly stated that he would "undoubtedly" have found the FEC's failure to take final action to be contrary to law—even as to the 1978 complaints—merely by virtue of the excessive delay alone. *Id.* In *National Right to Work v. Thompson*, Fed.Elec.Camp.Fin.

Guide ¶ 9042 (CCH) (D.D.C.1977), moreover, Judge June Green expressly stated that it was "the biannual occurrence of elections" that made "expeditious resolution" of such complaints crucial. *Id.* at 50,465.

■ The remedial purpose of the federal election laws would be wholly undermined if the FEC were to process the complaints before it without any regard to the possible recurrence of a disputed practice in a succeeding election without any resolution of the practice's legality.[10] As FEC's counsel himself has said, the Commission is in no position to guarantee either to the complainant before the FEC or to the public at large that a challenged practice or course of conduct will *not* be utilized or continue in a subsequent election, and indeed it must be assumed that such practices and conduct *will* recur—and may do so with little prior notice. *See* Transcript at 72, 74. Also, whether the disputed practice is used against the same candidate who challenged it before the FEC or against another candidate instead, its continued use could create a cloud over the election process wherever it appears. If a challenged practice is indeed legal, then that announcement should be made *prior* to the next election so that *all* of the actors in an electoral campaign—rather than only those who risk FEC sanction—can take advantage of it. If a challenged practice is illegal, then making that announcement only *after* a successive election where the practice may have recurred is not the kind of administrative functioning contemplated by Congress.

The need for a decision before an imminent election is an appropriate corollary to the wise and prudent safeguards that have been built into the federal election laws to protect the privacy and other interests of respondents. There is no indication that Congress intended to permit these protec-

---

**9.** Senator Pell, Chairman of the Committee on Rules and Administration which reported the bill pointedly referred to the purpose of the draftsman "to assure that Commission does not *shirk* its responsibility...." 125 Cong.Rec. 36754 (1979) (emphasis added)

**10.** The Commission counsel advised the Court at the hearing on this matter that "the Commission is certainly aware of election day as a milestone," and that the Commission is not supposed to be "election day blind." Transcript at 46.

tions to be used to delay Commission action on a complaint about one congressional election until after the next one. Without rendering judgment as to whether such abuse actually occurred or is threatened in this case, the fact remains that such suspicion will inevitably arise whenever resolution of a dispute drags on from before one election until after another one. *See, e.g., Common Cause, supra,* at 744.

Contrary to law, the Commission has failed to investigate the allegations in plaintiff's October 29, 1982 letter/complaint "expeditiously." Title 2 U.S.C. § 437d(a)(9). Furthermore, if the Commission decides that there is no probable cause, that will be the end of the matter. If it decides that there is probable cause, it is its prerogative in the first instance to decide whether or not to exercise its statutory authority to shorten the conciliation process in view of the imminence of the election. But the long delay here has created a situation in which the Commission cannot exercise that discretion unless it decides within 15 days before the election whether or not there is probable cause. The Commission has threatened to fail to act within that time. Such failure would disenable the Commission from exercising its discretion to shorten the conciliation period. In the circumstances here, such a failure to act so as to prevent its exercise of its own discretion would be an arbitrary and capricious abuse of the Commission's discretion.

It was for these reasons that the Court entered its October 4 order requiring the Commission to determine whether or not there is probable cause by October 19, or show cause on that day why it by then failed to make such a determination.

In reaching this conclusion, the Court has carefully considered the language of section 437g(a)(8)(C), which states that the Court

> may direct the Commission to conform with [the declaration that the Commission's failure to act is contrary to law] within 30 days, failing which the com-

plainant may bring, in the name of such complainant, a civil action to remedy the violation in the original complaint.

The section gives a plaintiff power, in his own interest and as a private attorney general, to sue where the Commission fails to do so. The 30 day hiatus limits only his right to sue, and does not suspend the court's power to require the Commission to conform its conduct to the law. Neither the October 4 Order nor this memorandum addresses the authority the court might have to review a decision of the Commission as to whether to effect conciliation, bring suit, or do neither.

■ In the circumstances of this case, judicial intervention requiring the Commission only to make a decision about probable cause before the 1984 election or explain why it cannot do so is not an intrusion on the Commission's prosecutorial discretion. A decision about the time constraints specifically stated in the Act or reasonably inferable from its context is quite different from a direction as to how the Commission should decide. The Court has not intruded on the Commission's discretion as to how it should deploy its personnel or other resources. If there are good reasons why it has not acted, or cannot act now, the October 19 hearing will afford a further opportunity to give an explanation, which has not yet been forthcoming.

## ON MOTION FOR RECONSIDERATION

This case is now before the Court from the Court of Appeals for reconsideration of its October 4, 1984 Order in this matter.[1] Plaintiff has moved for reconsideration of the cross-motions for summary judgment. The Court has received and has had an opportunity to review supplemental pleadings submitted by the parties in this matter and has conducted a hearing in camera. Upon consideration of those pleadings, the representations of counsel, and the entire record in this case, the Court is in a position to render a decision on reconsideration.

---

1. *See Rose v. FEC,* No. 84–5719 (D.C.Cir. Oct. 24, 1984) (order granting summary reversal).

As stated in the Court's previous memorandum, plaintiff in this action seeks a declaratory judgment and injunctive relief, pursuant to 2 U.S.C. § 437g(a)(8)(C), on account of the Commission's alleged failure to take action on a letter/complaint (subsequently designated MUR 1503) that Congressman Rose filed with the FEC on October 29, 1982. The Court has already recounted, in its previous memorandum, the nature of the plaintiff's FEC complaint as well as the Commission's handling of the complaint through October 4, 1984, the date on which the Court originally granted summary judgment in favor of plaintiff. That description is incorporated herein by reference.

On October 24, 1984, the Court of Appeals granted the FEC's motion for summary reversal, and set out the proper tests to be applied in a matter such as this one, where plaintiff seeks to show that the Commission's failure to resolve his October 29, 1982 FEC complaint is "contrary to law" in violation of 2 U.S.C. § 437g(a)(8)(C):

[I]n using the language "contrary to law," Congress appears to have intended that the unreasonableness of the Commission's delay in completing its task be tested under standards generally applicable to review of agency inaction. *See Common Cause v. FEC*, 489 F.Supp. 738, 744 (D.D.C.1980) (indicating that the court may consider, in applying the contrary to law standard, "the credibility of the allegation, the nature of the threat posed, the resources available to the agency, and the information available to it, as well as the novelty of the issues involved."). We have recently had occasion to remark on the factors which courts should generally consider on review of agency inaction under general principles of administrative law and the Administrative Procedure Act, 5 U.S.C. § 706(1). *See Telecommunications Research & Action Center v. FCC* [750 F.2d 70, 79–80], No. 84–1035 & 84–5077, slip op. at 18–19 (D.C.Cir. Oct. 24, 1984) (citing factors). On remand, the district court is free to reconsider its decision in light of these relevant factors.

The factors laid out in *Common Cause* were carefully considered by the Court prior to its Order of October 4, 1984, and were addressed in its Memorandum of October 15, 1984:

The standards for determining whether the FEC's failure to act on any given complaint is contrary to law have been set out in *Common Cause v. Federal Election Commission*, 489 F.Supp. 738 (D.D.C.1980). In that case, Judge Parker indicated that the factors a court should consider in making this determination include:

the credibility of the allegation, the nature of the threat posed, the resources available to the agency, and the information available to it, as well as the novelty of the issues involved.

*Id.* at 744. The FEC itself concedes, in its memorandum on the cross-motions for summary judgment, that "[t]he allegations made by the plaintiff in his administrative complaint were credible." Defendant's Memorandum at 11. The FEC also concedes that "[t]he nature of the threat posed by this case is significant." *Id.* As for the resources available to the agency, counsel for the FEC conceded at the hearing on this matter that there is currently no staff deficiency that would impair its ability to act on the complaint at this time. Transcript at 44. The FEC also states that it "has accumulated a large amount of evidence in this case," Defendant's Memorandum at 12, and nowhere has claimed that any additional evidence is necessary for it to be able to reach a final determination. Finally, the FEC states that "the issues raised in this case were both novel and complex." *Id.* At the same time, though, the FEC has had the benefit of two years in which to consider those issues, and nowhere has the FEC represented that the novelty of the issues remains an obstacle to their resolution.

*Id.* at 9–10. Nothing in the subsequent pleadings or argument contradicts any of these conclusions. The *Common Cause* factors thus at least suggest that as of

October 4, 1984, any "further delay" by the Commission would have been contrary to law. *Common Cause, supra,* at 745.

The Court, at the time of the October 4 Memorandum, did not have the benefit of the Court of Appeals' remarks in *Telecommunications Research & Action Center ["TRAC"] v. FCC,* 750 F.2d 70, 79–80 (D.C. Cir.1984). While several prior cases had addressed the considerations to be taken into account in cases "involving claims of unreasonable delay," *TRAC, supra,* at 79, the Court had not previously "articulated a single test" for making such a determination. *Id.* In *TRAC,* the Court set out six factors to be considered:

> (1) the time agencies take to make decisions must be governed by a "rule of reason," [*Potomac Electric Power Co. v. ICC*] *PEPCO,* 702 F.2d [1026] at 1034 [D.C.Cir.1983]; [*MCI Telecommunications Corp. v. FCC*] *MCI,* 627 F.2d [322] at 340 [D.C.Cir.1980]; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, [*Public Citizen Health Research Group*] *PCHRG v. FDA,* 740 F.2d [21] at 34–35 [D.C.Cir.1984]; *PCHRG v. Auchter,* 702 F.2d [1150] at 1158, n. 30 [D.C.Cir.1983]; *PEPCO,* 702 F.2d at 1034; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; *PCHRG v. FDA,* 740 F.2d at 34; *PCHRG v. Auchter,* 702 F.2d 1157; *see also Blankenship v. Secretary of Health, Education, and Welfare,* 587 F.2d 329, 334 (6th Cir.1978); (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, *see, e.g., PCHRG v. FDA,* 740 F.2d at 34; *PCHRG v. Auchter,* 702 F.2d at 1158; (5) the court should also take into account the nature and extent of the interests prejudiced by delay, *PCHRG v. FDA,* 740 F.2d at 35; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that

agency action is 'unreasonably delayed.'" *PCHRG v. FDA,* 740 F.2d at 34.

*Id.* at 79–80. The Court now applies these factors in turn.

■ (1) *"Rule of Reason"*—The Court of Appeals' prior explanations of the "rule of reason" are very helpful in applying this factor to the instant case. In *MCI Telecommunications Corp. v. FCC,* 627 F.2d 322 (D.C.Cir.1980), the Court stated that the 1934 Communications Act

> assumes that rates will be finally decided within a reasonable time encompassing months, occasionally a year or two, but not several years or a decade. The standard of "just and reasonable" rates is subverted when the delay continues for several years. Ratemaking theories may change; new information may become relevant; one proceeding may have to take account of another. But there must be some reasonably prompt decisionmaking point at which ... [the agency must make a determination on the issue before it].

*Id.* at 340. The delay in this case is now passing two years, and events have not stood still in the interim. As stated by the Court of Appeals in *PEPCO v. ICC,* 702 F.2d 1026 (D.C.Cir.1983):

> Quite simply, excessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decisionmaking into future plans.

*Id.* at 1034. These concerns are obviously strong in an election context, where it is crucial that "public confidence" and trust in the integrity of the process be maintained, and where continuing uncertainty over the legality or illegality of a particular campaign practice can be highly disruptive of candidates' abilities to "plan" and conduct their electoral efforts. The Court of Appeals has held that there is no "presumption" that such matters will be dealt with before the next successive election after the one in which an FEC complaint

has been filed. At the same time, the failure to do so obviously "saps the public confidence in [the Commission's] ability to discharge its responsibilities and creates uncertainty for [candidates] who must incorporate the potential effect of possible agency decisionmaking into future plans." *Id.* Thus, while there is no "presumption" such as the one relied on by the Court in its earlier memorandum, the "rule of reason" as described by the Court of Appeals suggests that the Commission's failure to act on this matter despite the passage of over twenty-three months since it was filed and before the current election campaign is at least a factor weighing in favor of a ruling that the Commission's delay was, on and before October 4, 1984, contrary to law.

■ 2. *"Statutory Indication of Speed Expected"*—In giving the Commission the "power" to "conduct investigations and hearings," 2 U.S.C. § 437d(a)(9), the Congress expressly characterized this power by adding the adverb "expeditiously." The Court is aware that a previous version of a separate section of the Federal Election Act—the "Enforcement" section at 2 U.S.C. § 437g—contained language stating that "any investigation *shall* be conducted expeditiously," 2 U.S.C. § 437g(a)(3)(A) (1976) (emphasis added), and that no such language appears in the paragraphs setting out the revised enforcement procedures enacted in 1979. *See* 2 U.S.C. § 437g (1982). However, the Court cannot conclude that the absence of such language in this separate provision of the Act relieves the Commission of the obligation to act expeditiously, or gives the Commission discretion to act non-expeditiously—at least not in the absence of more explicit legislative history indicating that this was intended. To the contrary, the 1979 change reduced the number of procedural steps in the Commission's handling of complaints, *see* H.Rep. No. 422, 96th Cong., 1st Sess. 2 (1979), U.S.Code Cong. & Admin.News 1979, p. 2860, thus facilitating *more* expeditious treatment. As noted in the Court's previous memorandum, the Act is studded with *short* deadlines governing the speed with which such complaints must be handled. Congress has expressly said that the Commission's power to investigate is power to do so "expeditiously," 2 U.S.C. § 437d(a)(9), and Congress nowhere states that the Commission has discretion to ignore the Act's deadlines or otherwise act non-expeditiously.

As stated in the Order On Reconsideration, the Commission's handling of this complaint has at various times been less than "expeditious." In the most recent pleadings and argument, plaintiff pointed to the fact that although the complaint was originally filed on October 29, 1982, the Commission consumed approximately 175 days before, on May 3, 1983, it filed its statement—which is a prerequisite to investigation by the Commission—that it had "reason to believe" that respondent had violated the Act.[2] Plaintiff represented, without contradiction by the Commission's representative, that such statements are normally issued by the Commission much more "expeditiously" than was the case here. The Commission's representative attempted to justify this delay on the ground that the issues raised by the plaintiff are difficult, important and original. Several times during his oral argument he reiterated the "importance" of the issues. He referred to the "unfortunately long time" that was required for this preliminary statement to be uttered. Yet, no priority was given to getting the matter investigated in anticipation of the obvious prospect that after January 1, 1984, the Commission's staff and resources would be heavily committed to new matters arising out of the imminent 1984 primary and general elections. The Commission further asserted that the 11-month period from May 3, 1983, to April 11, 1984, was consumed with discovery and other aspects of its investigation. It is apparent from a review of the chronology that even if, as the Commission's representative stated, the respondent's resistance to discovery was not frivolous, an obvious by-product of that resistance was delay. The Commission allowed the discovery to delay this 1982 Congres-

---

**2.** Plaintiff urges that 2 U.S.C. § 437g(a)(2) does not contemplate any investigation for the filing

of such a statement other than consideration of the complaint and respondent's response.

sional election matter until it was competing with new 1984 election priorities. The Commission's effort to overcome the delay attributable to these discovery disputes was not commensurate with the admitted and obvious importance of this matter, or the indication of the statute that the Commission should conduct its investigations "expeditiously."

This factor too, thus, weighs heavily in favor of a finding that the Commission's failure to act was, on and before October 4, 1984, contrary to law.

■ 3. *"Nature of the Sphere of Regulation"*—The Federal Election Campaign Act regulates a very sensitive area of the public interest. While damage due to agency delay may be tolerable when the interests at stake are merely economic, they are less tolerable when the interest at stake is less subject to easy remedy, such as where human health and welfare are at stake, as stated by the Court of Appeals. Similarly, given the extreme sensitivity of political expression and the electoral process in our constitutional system, the failure of the Commission to pursue this matter expeditiously at all times in its handling of this matter is less tolerable than would be delay in an economic regulation context. This factor too, thus, weighs in favor of a finding that the Commission's delay was, on and before October 4, 1984, contrary to law.

■ 4. *"Effect on Agency Priorities of Ordering Expedited Action"*—As noted, the FEC represented at the hearing on this matter on October 4, 1984, that there was no staff or other resource deficiency precluding the ability of the Commission to act on the complaint at that time. Transcript of Hearing of October 4, 1984, at 44. Nothing in the more recent pleadings or arguments contradicts this representation. Thus, this factor does not weigh against requiring the agency to proceed to an expedited resolution of the matter.

■ 5. *"Nature and Extent of Interest Prejudiced by Delay"*—The Commission has conceded that the "nature of the threat posed by this case is significant." Defendant's Memorandum on Cross-Mo-

tions for Summary Judgment at 11. Moreover, the fact that Congressman Rose filed his FEC complaint in connection with activities that took place during the 1982 election, which has already concluded, does not make the "nature" or "extent" of the threat any less significant. The FEC has expressly conceded that Congressman Rose's complaint describes a course of conduct by the respondent that may well continue or recur *even though* the 1982 election has passed. Transcript of October 4, 1984 Hearing at 74. Congressman Rose is himself a candidate for re-election at this time and his campaign, as well as the campaigns of others, could well be affected by such recurrence. Thus, this factor also weighs heavily against tolerating the delay that occurred in this matter.

■ 6. *"Agency Impropriety"*—As the Court of Appeals has explained, the Court need not find "any improprieties" in the Commission's actions to find that delay beyond October 4 would be "unreasonable." Thus, the Court need not and does not make such findings.

On careful consideration of the factors laid out above, the Court finds that on and before October 4, 1984, the Commission's action on plaintiff's complaint was unreasonably delayed contrary to law, in violation of the standards of 5 U.S.C. § 706(1) as incorporated in 2 U.S.C. § 437g(a)(8)(C). An Order On Reconsideration has granted plaintiff's motion for summary judgment, denied defendant's motion for summary judgment, issued a declaration pursuant to 2 U.S.C. § 437g(a)(8)(C), and granted other relief as appropriate.

## ORDER

On January 29, 1985, defendant Federal Election Commission submitted notice to the Court that respondents in MUR 1503 had, that day, publicly filed a complaint in a newly instituted action against the Commission, *National Congressional Club v. Federal Election Commission*, No. 85–0299 (D.D.C., filed Jan. 29, 1985), which disclosed the proceedings and current status in MUR 1503. The submission states that, "[i]n light of the public filing of that complaint, ... the Commission no longer

objects to lifting the court's seal on the remainder of the record in this case." The Court has reviewed the publicly-filed complaint in No. 85–0299 and heard counsel for the parties and *amicus curiae* at a hearing in open court on January 31, 1985. None opposes unsealing of the record in this case.

A Court of Appeals Order filed November 14, 1984, requires the Federal Election Commission to give that Court prompt written notice of any order of any other court which makes the sealed documents public. That Court should have an opportunity to react to the notice.

In light of the foregoing, it is this 31st day of January, 1985, hereby

ORDERED: that the Protective Order of October 5, 1984, should be, and is hereby, VACATED, effective at noon, February 4, 1985.